## ECONOMY FORMS CORPORATION

### v.

### KANDY, INC.

### Civ. A. No. 2428.

United States District Court,
N. D. Georgia,
Rome Division.
March 29, 1974.

William E. Davidson, Jr., Rome, Ga., William J. Koehn, Des Moines, Iowa, for plaintiff.

Jack Rogers, Rogers, Magruder & Hoyt, Rome, Ga., John D. Raffaelli Raffaelli, Hawkins & Carter, Texarkana, Tex., for defendant.

## ORDER

O'KELLEY, District Judge.

The foregoing matter was tried before the Court without a jury. Based upon the evidence and stipulation of the parties, the Court finds that it has jurisdiction of the case, and makes its findings of fact and conclusions of law as follows:

## FINDINGS OF FACT

The Court finds that the plaintiff and defendant entered into a Purchase Order contract in the amount of $74,096.14 whereby the plaintiff was to manufacture and deliver to defendant some steel concrete forming equipment which included Cantilever forms for Monoliths D-1 through D-11, the Ogee forming equipment and certain equipment for the construction of piers, all of which equipment was to be used on the Carters Reregulation Dam Project where the defendant was general contractor for the construction of said project. At the time of entry into the Purchase Order, defendant paid $17,985.00 leaving a balance of $56,111.14. The contract provided that interest was to be paid on the outstanding balance, thirty days after delivery, at 10 percent per annum. The parties in the pretrial order stipulated that the equipment was delivered starting January 8, 1970, through April 16, 1970. The Court finds that there is no dispute as to the contract terms nor as to the amount of the balance left owing on said contract, it being $56,111.14, and interest at 10 percent thirty days after delivery.

The Court further finds that the plaintiff, pursuant to the terms of Exhibit 2, shipped to defendant on open account certain accessory equipment in the amount of $829.87, however, the defendant alleges that this equipment should have been provided to the defendant as a part of the equipment delivered under the purchase order contract between the parties. Said equipment was furnished November 1, 1971.

Defendant, in its counterclaim, claims that it is entitled to an offset in the amount of $48,750.25, and alleges that certain oral representations were made to it by the plaintiff's sales agent, wherein it was represented to defendant that the forms would accommodate the waterstop requirements on the job and that there would be no need for supplementary wood to be used on this job. The defendant claims that as a result of these representations, it purchased the equipment, that the equipment did not perform as warranted in that it was not designed to accommodate waterstop and that additional wood was needed in order to perform the job.

Plaintiff has raised certain defenses based upon the contract limiting warranties and excluding additional consequential damages. Plaintiff contends that the contract is clear and unambiguous on its face and does not set out any warranties in addition to those clearly stated on the face of the document itself, and that it was not accepted by the plaintiff until such time as the type of equipment was demonstrated and explained to the defendant's agents and was accepted by the defendant through its agents. Plaintiff further raises the affirmative defenses to defendant's counterclaims of waiver, estoppel and mitigation of damages.

The Court finds that the defendant was advised by plaintiff that equipment would accommodate waterstop prior to the time that said purchase order contract was executed by defendant. Sometime in October the plaintiff's agent, Gary Pursley, was notified by plaintiff's home office that the purchase order as submitted, could not be accepted by plaintiff unless defendant would agree to accept the equipment as shown on the erection drawings which called for a split waterstop. It further appears that in October, 1970, the defendant's agents at the job in Carters, Georgia, received copies of the plaintiff's erection drawings and had an opportunity to review them.

In November 1970, Mr. Don Bryan, district manager for the plaintiff, went to the job at Carters, Georgia, and discussed the job with the defendant's superintendent on the job and Mr. John Cory. He received oral approval of the erection drawings and then advised the plaintiff's home office that the defendant had approved the erection drawings and had accepted the purchase order, and the plaintiff was to commence the manufacturing of the equipment pursuant to the erection drawings. Based on this, plaintiff did accept the purchase order and manufactured the equipment. It further appears before this date that the defendant submitted a split waterstop to the Corps of Engineers, which submission was subsequently disapproved. Mr. Tom Jaudon, the field representative for the plaintiff, visited the job site upon three occasions in January. At the last meeting in January, there was enough equipment on the job site to begin setting it up in preparation for the job. At that time Mr. Jaudon went over the erection drawings and equipment on the job and the sequence of work to be done on the project with the defendant's superintendent, Mr. Forrest Nowlin. At that time Mr. Jaudon discussed with Mr. Nowlin and Mr. Cory, the waterstop accommodation and went over various methods of waterstop accommodation with them. He was not advised that the waterstop accommodation set out in the erection drawings was not satisfactory to the defendant.

The first pour on the job, Monolith D-1, was commenced in April, 1971, at which time the pour was being made immediately above the rock and did not require the use of the plaintiff's Cantilever forms. Defendant built some wooden forms to accommodate waterstop but did not advise Mr. Tom Jaudon, who was there assisting them, that they were unhappy with the manner of waterstop accommodation nor did they request any modification of the forms at that time. Mr. Jaudon, shortly thereafter on April 6, 1970, talked to defendant's president,

Mr. Frank King, and advised him that the defendant would need additional equipment in order to complete the scheduling of the pours on the piers in an orderly manner. As a result of that conversation, the defendant executed a purchase order with the plaintiff for additional pier forms, which equipment was delivered to defendant and paid for by it. Subsequently, in May of 1971, the plaintiff's agent, Mr. Tom Jaudon, met with the defendant's agent, Mr. King, at the airport in Atlanta, Georgia, where Mr. Jaudon gave to him a section of split waterstop. Mr. Frank King advised Mr. Jaudon that he would submit this to the Corps of Engineers and that if he needed any help in submitting it, he would call upon Mr. Jaudon for his assistance. Mr. Jaudon's assistance was never requested and he was not advised of the fact that the split waterstop accommodation had been denied. During the construction the defendant used the forms out of the sequence in which they were designed to be used as provided by the plaintiff and they were taken all over the construction location. Additional holes were drilled in most of the forms by defendant's agents because of this improper use of the forms.

The only forms which would have had to have been redrilled would at the most have involved only six individual bulkheads of the eleven monoliths and would have involved no more than thirty-six panels, which at two holes per panel would have constituted no more than seventy-six holes.

The defendant failed to produce any evidence from its own records which would advise the court of the number of holes which were allegedly drilled as a result of the waterstop problem. In addition no witness could testify as to the number of holes which allegedly were filled as a result of this problem. The Court further finds that all of the Economy Forms panels on the job were drilled as part of the purchase order contract and if they were to be filled, this would have been a part of the defendant's obligation to do so having nothing to do with

any job conditions. Any holes drilled on the forms not affected by waterstop would also have been defendant's responsibility.

The defendant in its claim had requested an amount of money for depreciation of the forms in the amount of $6,744.00 However, the defendant did not press this claim at trial since the forms had been repaired in those areas where it was alleged that additional bolt holes had to be added because of the problem of waterstop accommodation.

Defendant claims that it spent $24,629.00 for all of the wood, small tools and materials on the job, including any wood which would have been used for the construction of the wooden forms used at the beginning of the job to accommodate waterstop. It was estimated that one-third of the wood, small tools and materials would have been used in the construction of these forms which were used to accommodate waterstop. It was admitted that the figures about which he was testifying were not from his own knowledge and that the defendant had no records which would substantiate the amount of wood, small tools and materials which were actually used by it in the construction of the forms. The defendant's agents did not testify as to the depreciated value of the materials or wood or their salvage value and defendant's testimony was never substantiated by proper foundation by the testimony of any other witness who had any actual knowledge regarding the amount of materials used for this project. Therefore, the Court makes no finding in this regard.

The defendant further complained that the forms supplied to it by Economy Forms for the forming of the Ogee, did not properly perform. It attributed its loss in this regard to $2,880.00, the amount which was paid for said Ogee forms. The forms had performed properly when used and had done the job when used. The defendant was making and using wooden forms at the same time it was the metal forms and that the two of them were being used in conjunc-tion with one another in order to allow the defendant to keep up with its construction schedule.

The Court further finds that the defendant is now reusing the metal forms on other jobs.

## CONCLUSIONS OF LAW

■■ The Court finds that the plaintiff is entitled to recover for the balance of its contract price in the amount of $56,111.14, plus interest at 10 percent commencing thirty days after the delivery of the forms. The Court must conclude that the equipment set out in plaintiff's Exhibit 2 in the amount of $829.87 was actually delivered to the defendant at the job site and used thereafter. The Court in reviewing this matter was provided with no evidence by defendant other than it felt it should not have to pay for this because it should have been a part of the original equipment. There was no testimony establishing that this was not equipment replacing that already delivered. Prior to this the defendant had purchased additional pier equipment and accepted and paid for it. The defendant having admitted it received, accepted and used the equipment, and there being no dispute as to the quality or value of the equipment, the burden of proof shifted to the defendant to demonstrate that the equipment was to have been a part of the original purchase order. The defendant having failed to produce any competent evidence substantiating its position, the Court will find for the plaintiff on this item.

The Court finding no dispute as to which law applies does not make any determination as to which state law is applicable. It is this Court's belief that the Uniform Commercial Code which governs the purchase order is uniform throughout the three states involved, that being Iowa, Georgia, and Texas.

■ It is apparent from the evidence offered by the defendant that defendant felt that at the time that it executed the purchase order submitted to it by plaintiff's agent, that said purchase

order was binding in some manner upon the plaintiff. However, a fair reading of the purchase order demonstrates that said purchase order was to be accepted finally only upon the signature of an officer of the plaintiff. It is rather clear that the defendant's agents in authority on the job site agreed to the form and manner that said forms were to be provided on the job and that was to be in accordance with the terms of the erection drawings which were submitted to the defendant's agents and accepted by them. Upon this basis the plaintiff executed and accepted the purchase order. The terms of the purchase order will be the terms governing the conduct between these parties.

The contract, having been an integrated document between the parties, controls the conduct of the parties. This purchase order contract stated,

> This agreement, together with the supplements, if any, attached hereto, incorporates all agreements and understandings of every kind and nature concerned on the subject matter hereof, and NO REPRESENTATION, WARRANTY (EXPRESSED OR IMPLIED) OR ESTIMATE OF ANY KIND OR NATURE NOT INCORPORATED HEREIN IS AUTHORIZED BY, NOR SHALL THE SAME BE BINDING ON ANY OF THE PARTIES HERETO.

This language being the basic agreement of the parties would exclude any contrary express warranty of fitness not specifically incorporated in the terms of the contract. In addition, based upon the agreement of both of the parties' agents prior to the final acceptance of the contract by the plaintiff, the agreement to provide the forms as shown in the erection drawings and as actually provided would be binding upon both parties. *See* Uniform Commercial Code § 2–202. Defendant's assertion that its job superintendent on the site could not bind it by its actions is not well taken.

Therefore, based upon the language of the contract and the expressions of in-tent of the parties, it would appear to the Court that the plaintiff did provide to the defendant that which it agreed to provide under the terms of the agreement between the parties.

However, even if this Court were to find that defendant was able to constitute an express or implied warranty of fitness which was breached by the manner of the performance of the contract by the plaintiff, the Court must still find that the defendant did accept the forms as set out in Uniform Commercial Code § 2–606(1)(a). That section requires that the acceptance of goods occurs when the buyer has had reasonable opportunity to inspect the goods and signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity.

The undisputed facts show that the defendant received the erection drawings in October, 1970, and the forms themselves in January of 1971. Defendant's agents, in their discussion with plaintiff's agent, Mr. Don Bryan, agreed that the forms as shown on erection drawings were conforming. In addition, the defendant's agents received and then used the forms in their delivered condition for many months without notifying the plaintiff that the goods were inadequate. This conduct on the part of the defendant led the plaintiff to believe that the goods were accepted and this affirmation of acceptance on behalf of the defendant led the plaintiff to execute and accept the purchase order contract and manufacture the goods in conformance with the agreement between the parties.

The evidence also demonstrates that the defendant failed under § 2–606 (1)(b) to reject the goods within a reasonable time. The definition of reasonable and seasonable time is set out under § 1–204(2), (3).

Reasonable is defined as:

> (2) What is a reasonable time for taking any action depends on the nature, purpose and circumstances of the action.

Seasonable is defined as:

(3) An action is taken 'seasonably' when it is taken at or within the time agreed or if no time is agreed at or within a reasonable time.

The question is then under these circumstances, what is a reasonable time. The Court finds that the parties were both in a commercial setting, that they were on an equal bargaining position. Based upon the bargaining position of the parties, a reasonable time under the circumstances would be a fairly short one. United States v. Crawford, 443 F.2d 611 (5th Cir. 1971); Dow Corning Corporation v. Capitol Aviation, Inc., 411 F.2d 622 (7th Cir. 1969). Based upon the time involved in this case between the date of the approval of the erection drawings in November and the first complaint to plaintiff's agents in May, some six months later, the notice was not reasonable under the circumstances. Robinson v. Jonathan Logan Financial, 277 A.2d 115 (D.C.Ct.App.1971), Julian C. Cohen Salvage Corp. v. Eastern Electric Sales Co., 205 Pa.Super. 26, 206 A.2d 331 (1965).

■ The Court further finds that the defendant's conduct in taking and using the goods under the circumstances as set out in § 2–606(1)(c), provides that acceptance occurs when the buyer:

[D]oes any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

It is apparent from the facts that the defendant did keep the goods and use them throughout the job and has continued to use them since that time. The defendant had the forms two to three months before actually using them, and in that time it could have rejected them entirely and built the job with wooden forms. However, it elected not to do this. Rather it decided to keep the forms, keep silent and continue to use them. It is the Court's opinion that this constitutes an acceptance of the goods as provided in § 2–606(1)(c). United States v. Crawford, 443 F.2d 611 (5th

Cir. 1971); Brule C. E. & E. Inc. v. Pronto Foods Corp., 3 Ill.App.3d 135, 278 N.E.2d 477 (1971); see also Hays Merchandise, Inc. v. Dewey, 78 Wash.2d 343, 474 P.2d 270 (1970); Ingle v. Marked Tree Equipment Company, 244 Ark. 1166, 428 S.W.2d 286 (1968); Atlantic Aluminum and Metal Distributors v. Adams, 123 Ga.App. 387, 181 S.E.2d 101 (1971).

■ In addition the Court finds that the defendant is barred from recovery on its counterclaim under Uniform Commercial Code § 2–607(3) and (4). Section 2–607(3) and (4) states:

(3) Where a tender has been accepted (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy . . . .

(4) The burden is on the buyer to establish any breach with respect to the goods accepted.

It is apparent that the defendant's agents on the job site were fully aware that the erection drawings provided that the waterstop as shown thereon was different than that set out in the engineering drawings provided by the Corps of Engineers. Defendant's agents accepted the erection drawings and subsequently accepted the forms as provided by the plaintiff. Subsequent to the receipt of the erection drawings in October, defendant subsequently received the forms in January. Thereafter in January its agents discussed and went over them with the plaintiff's agent. Thereafter it erected them and used them on the job and had an opportunity and a reasonable time to notify the plaintiff of any alleged deficiencies. It failed, however, to notify the plaintiff within a reasonable time and this failure is a bar against recovery for all damages including any breaches of warranties which were caused by a difference in the waterstop characteristics or by any other apparent or obvious qualities of the goods. Ingle v. Marked Tree Equipment Company, 244 Ark. 1166 428 S.W.2d 286

·(1968); G & D Poultry Farms, Inc. v. Long Island Butter & Egg Co., 33 A.D. 2d 685, 306 N.Y.S.2d 243 (1969); Tucson Utility Supplies, Inc. v. Gallagher, 102 Ariz. 499, 433 P.2d 629 (1967); Necho Coal Co. v. Denise Coal Co., 387 Pa. 567, 128 A.2d 771 (1957).

In short, the defendant failed to carry its burden on the counterclaim.

It is therefore ordered, adjudged and decreed

(1) That the plaintiff have judgment against the defendant in the amount of fifty-six thousand, one hundred eleven dollars and fourteen cents ($56,111.14), together with interest thirty days after delivery of said forms; and

(2) That plaintiff have judgment against the defendant in the amount of eight hundred twenty-nine dollars and eighty-seven cents ($829.87), together with interest at the legal rate, thirty days after November 1, 1971; and

(3) That defendant's counterclaim against the plaintiff be dismissed and that the defendant recover nothing against the plaintiff.