CLOW CORPORATION, Plaintiff,

v.

METRO PIPELINE COMPANY, INC.
and United States Fidelity & Guar-
anty Company, Defendants.

Civ. A. No. C75–1912A.

United States District Court,
N. D. Georgia,
Atlanta Division.

Aug. 11, 1977.

As Amended Aug. 17, 1977.

J. Ben Shapiro, Jr. and David R. Hendrick, Stokes & Shapiro, Atlanta, Ga., for plaintiff.

C. James Jessee, Jr. and James B. Ritchie, Atlanta, Ga., for defendants.

## I. STATEMENT OF THE CASE

HOOPER, Senior District Judge.

This is a suit by sub-contractor Clow Corporation (hereinafter referred to as Clow) against general contractor Metro Pipeline Company, Inc. (hereinafter referred to as Metro) for the purchase price of goods and materials furnished on account, and against surety company United States Fidelity & Guaranty Company (hereinafter referred to as USF&G) for the unpaid balance with respect to the bonded project only. Contractual service charges based on any unpaid balances of more than thirty days after receipt of the goods involved are also sought to be recovered from those defendants. Plaintiff has moved the Court for Summary Judgment against Metro in the amount of $190,417.30[1] plus contractual service charges, and against USF&G in the amount of $182,843.04 plus contractual service charges.

Defendants assert the affirmative defense as well as a counterclaim based on an alleged failure of consideration in the form of allegedly defective goods and seek to set-off any recovery by Clow Corporation in the amount of $74,251.55. Defendants have also filed a motion for Summary Judgment to deny plaintiff any recovery concerning plaintiff's claim for service charges on balances owed more than thirty days after delivery.

## II. STATEMENT OF MATERIAL FACTS ABOUT WHICH THIS COURT FINDS THERE IS NO GENUINE ISSUE

1—Metro was the general contractor on a public improvement project (hereinafter re-

---

1. While plaintiff's motion for Summary Judgment against Metro seeks $190,426.30, plaintiff by letter to the Court dated August 8, 1977 admits a $9.00 arithmetical error in Invoice No. 18939, thereby reducing the amount claimed against Metro to $190,417.30.

ferred to as the Project) for the Board of County Commissioners of Spalding County, Georgia, involving water main extension in that county.

2—Clow is a manufacturer and supplier of heavy gauge utility grade cast iron pipe and related fixtures, accessories, and materials.

3—Prior to Metro's receiving award of the prime contract, Clow sent by mail to Metro a proposal concerning the pipe and related materials for the Project in the form of an "estimate number 718–228" which provided a description of the size, type, and quantity of materials indicated by the Project plan specifications and drawings.

4—Metro placed an order with Clow for the goods and materials initially required for the Project, which materials and goods were in the nature of cast iron pipe, valves, and related fixtures and accessories.

5—The original purchase order regarding the Project was reduced to writing on the standard form Clow purchase order which was executed by Metro and signed by its President and Chief Executive Officer, Cecil M. Forbes, Jr. Said purchase order stated the quantities and prices for the initial order and also set forth the applicable terms and conditions of the contract, which included the following language:

6. Terms are NET 30 days. A service charge of 1% per month will be added to all past due accounts.

6—During the course of installation of the water main segment, extending over more than one year, the original order by Metro to Clow was modified and altered numerous times with respect to the quantity, sizes, and types of goods and materials to accommodate specification changes by the Project engineer.

7—From November, 1971 through March 1973 Clow made numerous shipments of goods and materials to Metro for use and installation in said Project. Each shipment was followed immediately by transmission of a Customer's Invoice Original copy of the Clow order and invoice form representing each shipment, which form set forth the Standard Clow Conditions and terms of sale. On the front face of each of said Customer's Invoice Original was printed or stamped the following:

TERMS NET 30 DAYS . . . a service charge of 1% per month will be added to all past due charges.

8—All of said goods and materials (see Fact # 7) delivered by Clow were received by Metro and practically all of the same were installed into the bonded Project.

9—At no time prior to suit did Metro object to the terms and conditions stated on the original purchase order, signed by Cecil M. Forbes, Jr., and the invoices with respect to each shipment of goods.

10—None of said goods and materials were rejected by Metro, nor was the acceptance of such goods and materials subsequently revoked. No notice of rejection of said goods and materials was given by Metro to Clow (see V).

11—Clow maintained an open running account which was composed of entries reflecting all invoiced shipments by Clow to Metro of goods and materials, the price thereof, and all payments and credit transactions pertaining thereto.

12—The current unpaid balance of the aforesaid account maintained by Clow for goods and materials supplied to Metro for the Project and other jobs is $190,417.30.

13—Metro acting by and through Cecil M. Forbes, Jr. acknowledged to Clow on several occasions that the aforesaid principal balance was accurate, and repeatedly assured Clow that it would be paid in full when Metro obtained sufficient funds (see V-B).

14—Of the unpaid principal balance referred to in Fact. No. 12 at least $182,843.04 is directly attributable to goods and materials installed in the Project.

15—Prior to filing its answer and counterclaim in the instant suit, Metro:

(a) did not give notice to Clow that Metro considers Clow to be in breach of its obligation with respect to the contract or sale of the subject goods and materials (see V-B).

(b) did not seek or request credits or refunds from Clow with respect to said goods and materials as a result of contended defects therein;

(c) did not assert or otherwise indicate that it believed or contended that it did not owe Clow the full principal balance or the constantly accruing service charge thereon.

16—The damages now sought by Metro against Clow by way of set-off or counterclaim represent the expenses allegedly incurred for testing and leakage investigation and repair (see V-B).

AS TO THE ALLEGED LIABILITY OF USF&G AS SURETY, THE COURT FINDS THE FOLLOWING ADDITIONAL FACTS ABOUT WHICH THERE IS NO GENUINE ISSUE:

17—USF&G issued and executed through its authorized agent a payment bond naming Metro as principal and USF&G the surety with respect to the Project. The appropriate premiums for said payment and bond were paid and Clow supplied the goods and materials (see Fact # 7) for installation and use in the Project directly to Metro pursuant to a direct contractual relationship with Metro, said goods and materials having been last furnished and supplied to the Project more than ninety days before the commencement of the instant suit.

18—Of the current unpaid principal balance on the account maintained by Clow for goods and materials supplied to Metro it is agreed by all parties that $182,843.04 pertained directly to unpaid invoices representing shipments of goods and materials for installation and use in the Project. Plaintiff, however, contends that said unpaid balance pertaining to the goods and materials installed in the same is $189,755.62 (see III).

19—On May 22, 1973, William M. Smithson (the Clow Credit and Billing Manager) sent by registered mail to USF&G notice that Metro's account was in default.[2] Said letter together with a certified statement and copy of all pertinent invoices was received by USF&G. In response USF&G sent a letter to Clow dated May 31, 1973.

20—Between the date of May 31, 1973 letter from USF&G to Clow and the date of the filing of this action, USF&G & Clow did not engage in any contact or communication.

## III. STATEMENT OF THE ISSUES WHICH ARE IN DISPUTE AND WILL HAVE TO BE TRIED

■ With respect to any liability by the surety in excess of $182,843.04 (see Fact # 4) a trial will be necessary. Clow alleges that $189,755.62 is the unpaid principal balance relating to goods and materials for the Project, however, defendants assert certain alleged misapplication of payment as well as misallocation of other non-bonded job invoices which would reduce said $189,-755.62 as claimed by plaintiff to $182,843.04. Such matters are conceded by all parties to be in dispute.

## IV. THE CONTRACT SUED UPON IN THE INSTANT CASE

With respect to the contract which is the subject matter of the instant suit, the Court finds the following:

1—The original purchase order signed by Cecil M. Forbes, Jr., President of Metro, together with the applicable Customer's Invoice Originals constitute the contract involved and state the terms and conditions to be applied.

2—In as much as the subject matter of said contract is the sale of goods and materials, the Uniform Commercial Code as enacted by the State of Georgia applies.

3—Service charges (or interest) at one per cent per month on the unpaid principal balance were incorporated in the terms of the agreement (see VII).

2. The amount claimed by Clow in said notice was more than the amount now sought by plaintiff in the above-styled action.

## V. LIABILITY OF METRO FOR THE PRINCIPAL UNPAID BALANCE

## A. LIABILITY AT THE CONTRACTUAL RATE FOR THE PURCHASE PRICE OF GOODS ACCEPTED

■ Between November, 1971 and March, 1973 Clow delivered to Metro pipe and accessories at a purchase price in excess of $700,000.00, all of which was received by Metro and practically all of which was installed into the Project. Section 2–606(1) defines acceptance of goods by the buyer as happening when

> the buyer (a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or (b) fails to make an effective rejection . . . , but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them, or (c) does any act inconsistent with the seller's ownership
>
> . . .

In a case that construes this section of the Georgia Uniform Commercial Code, the Fifth Circuit Court of Appeals stated:

> It is undisputed that Fram furnished the 18 fuel/separator units called for by the contract, and that Crawford received and installed all 18 units . . . no case is reported in which the Georgia courts have had occasion to interpret 2–606(1)(c). Courts in other jurisdictions, interpreting the same section of the Uniform Commercial Code, have held that installation by the buyer of heavy equipment supplied by the seller is an act inconsistent with the seller's ownership. See *Marbelite Company v. City of Philadelphia* (1966), 208 Pa.Super. 256, 222 A.2d 443 (traffic signal equipment); *Park County Implement Co. v. Craig*, Wyo. 1964, 397 P.2d 800 (hoist and dump bed on vehicle). We believe that the Georgia courts, confronted with the same issue in the instant case, would give § 2–606(1)(c) the same construction. A buyer who has accepted goods may under certain conditions revoke his acceptance. Georgia U.C.C. § 2–608. However, once Crawford

accepted and installed the units supplied in place on the Albany site, any subsequent attempt at revocation was ineffective. *United States v. Crawford*, 443 F.2d 611, 613 (5 Cir., 1971).

See also *Economy Forms Corporation v. Kandy, Inc.*, 391 F.Supp. 944, 949–950 (N.D. Ga., Rome Div., 1974) and *Atlantic Aluminum & Metal Distributors v. Adams*, 123 Ga.App. 387, 390, 181 S.E.2d 101 (1971) (error for trial court not to grant summary judgment in favor of plaintiff). The Court finds that in the instant case the goods and materials having been installed into the ground in the Project were accepted by Metro. It is also important to note at this point that Metro failed to make any rejection of the goods within a reasonable time after delivery by seasonable notification to Clow (see U.C.C., § 2–602(1), and also failed to comply with the buyer's duties as to any goods that Metro might have rightfully rejected under U.C.C. § 2–603.

The goods therefore having been installed into the ground are alleged by the defendant to have been defective causing leaks and further expense to Metro in the amount of $74,251.65 (the same having been asserted as an affirmative and counterclaim). The legal issue before the Court is whether or not Metro, having previously accepted the goods, made an effective revocation of acceptance in accordance with U.C.C. provision 2–608 within a reasonable period of time. It appears from the record that the time at which the alleged latent defects became obvious to Metro was no later than the time of testing, or shortly after installation, that the leakage problems alleged were immediately repaired by Metro to pass the leakage test and thereby be certified by Spalding County, that all segments of the water main extension were subsequently accepted by Spalding County and are now part of a functioning system, and that none of the duties previously referred to under § 2–603 were performed by Metro in connection therewith. The Court cites § 2–608 which states:

> Revocation of acceptance must occur within a reasonable time after the buyer

discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

It is clear from the record that Metro, after having installed the goods into the Project and having allegedly repaired the same, did not notify Clow that it was revoking its acceptance, did not request from Clow credit for any allegedly defective goods, and did not perform the duties required by § 2–603 of the U.C.C. Therefore, the Court finds that Metro failed to revoke its acceptance of the same.

Consequently, in as much as the goods were delivered, received, and accepted no rejection or revocation of acceptance effectively made, "the buyer must pay at the contract rate for any goods accepted." Georgia Code § 109A–2–607(1). In accordance therewith, the Court holds that Metro as a matter of law is liable for the purchase price of all goods and materials delivered on account to the Project and to other jobs in the amount of $190,417.30.

B. FAILURE OF AFFIRMATIVE DEFENSE AND COUNTERCLAIM AS A RESULT OF FAILURE TO GIVE PROPER AND TIMELY NOTICE UNDER GEORGIA CODE § 109A–2–607(3)(a)

The Uniform Commercial Code § 2–607(3)(a) reads:

Where a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

Many courts have attempted to construe this U.C.C. section requiring notice and to apply the same to various factual situations. The Court will discuss a few of the more relevant and analogous decisions.

In the first place though, it is important to point out the "draftsmen's comment" (4) to the foregoing section:

4. The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome, and must be watched. There is no reason to require that the notification which saves the buyer's rights under this section must include a clear statement of all the objections that will be relied on by the buyer, as under the section covering statements of defects upon rejection (Section 2–605). Nor is there reason for requiring the notification to be a claim for damages or of any threatened litigation or other resort to a remedy. The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation.

In the case of *Eastern Airlines, Inc. v. McDonnell Douglas Corporation*, 532 F.2d 957 (5 Cir., 1976), the Court of Appeals was confronted with a suit by an airline against an aircraft manufacturer for alleged breach of contract in which the contention was made that the jets were delivered 7426 days late. The issue before the Court was whether the notice given by Eastern was both sufficient and timely as a matter of law. The Court of Appeals held that under the circumstances the issue should have been submitted to the jury to determine

[W]hether Eastern's conduct throughout the life of the contracts constituted adequate and timely notice to McDonnell that it was considered to be in breach of the contract (p. 980).

It is also important to recognize the comment made by the Court in footnote 62 on page 979, in which it stated the following:

We recognize, of course, that once an airline begins to build a fleet with a particular make of airplane it cannot easily switch to a competing manufacturer. Eastern, therefore, is correct in pointing out that as of 1965, it was effectively 'married' to Douglas. The conjugal nature of its relationship with Douglas,

however, did not relieve Eastern of its obligation of commercial good faith. As we have seen, the notice requirement reconciles the seller's right to early warning of claims for breach with the need to accommodate the buyer who, for reasons of necessity, has to accept a tender which is not in full compliance with the contract. In a continuing contractual relationship, therefore, the buyer must decide whether the benefits of claiming a breach of contract outweigh the need for a close rapport with the seller.

The Court also noted in its opinion that all of the buyer's dealings have to be evaluated under the standard of commercial good faith, and also that while adequate notice might be given at one point in time subsequent actions by the buyer "might dissipate its effect"; and that, therefore, the buyer's conduct must be evaluated as a whole under the rule of § 2–607(3)(a) which is designed to defeat commercial bad faith.

In the case of *Cotner v. International Harvester Company*, 260 Ark. 885, 545 S.W.2d 627, 20 U.C.C.Rep. 1169 (1977), the court faced a factual situation in which the buyer paid all repair bills relating to the alleged defect (except for one), didn't call or write to the seller's headquarters about the alleged defect, merely talked with the seller's salesman about trading in the trucks in dispute, and merely asked the seller's mechanic how the buyer could stop the trouble subsequently alleged. The court there held that notice as required by § 2–607(3)(a) must be more than a complaint, and that it must either directly or inferentially inform the seller that the buyer demands damages upon an asserted claim of breach of warranty. Furthermore, the court explained that the reasonableness (timeliness, form and substance) of the notice is generally a question of fact for the jury, but that

[W]here all the evidence is such that it can lead reasonable minds to only one conclusion as to the sufficiency of notice, the question presented is one of law to be resolved by the court (545 S.W.2d p. 630, 20 U.C.C.Rep. p. 1172).

The court concluded that the manufacturer had not been advised of a claimed breach of warranty nor that the buyer was looking to it for compensation or for remedial action, and that conversation with a salesman concerning a possible trade-in of the goods was not sufficient notice; and therefore, § 2–607(3)(a) was not satisfied.

In the case of *Atlantic Aluminum and Metal Distributors v. Adams*, 123 Ga.App. 387, 181 S.E.2d 101, 103 (1971) the court stated

[T]he defendant corporation's counter claim for damages is predicated upon an allegation that the aluminum was defective.

With respect to actions by the buyer under the circumstances the following appears:

Adams [president of defendant buyer] further testified that they telephoned and complained to plaintiff about the material but were told that they would do nothing and that 'we were stuck with it'. Adams then testified that they continued to accept delivery of the aluminum and rejected none of it, that they purchased some special machinery and by performing a second machining operation they were able to overcome the instability problem and produce acceptable parts . . . Defendant Adams testified that the defendant corporation had sustained a fire loss for which there was an unsettled insurance claim; that they did not deny they owed the debt to plaintiff evidenced by the notes; and that 'we were willing to pay if they went along with us until we got our insurance settlement.'

Other relevant citations involving a construction of U.C.C. § 2–607(3)(a) are *United States v. Crawford*, 443 F.2d 611 (5 Cir., 1971); *Southern Concrete Products Company v. Martin*, 126 Ga.App. 534, 191 S.E.2d 314 (1972); *Coast Scopitone, Inc. v. Self*, 127 Ga.App. 124, 192 S.E.2d 513 (1972); *Economy Forms Corporation v. Kandy, Inc.*, 391 F.Supp. 944 (N.D.Ga., Rome Div., 1972).

In light of the law as stated above construing § 2–607(3)(a) of the Georgia version of the Uniform Commercial Code the Court

holds as a matter of law that Metro did not give effective notice to Clow of any contented breach and is, therefore, barred from any remedy, including its asserted counterclaim. While Metro alleges that on at least two occasions the president of Metro engaged in conversation with Steve Schneider, Clow salesman, concerning unusual erosions of certain pieces of pipe, it appears ostensible from the record that Metro never requested credit for Clow products now allegedly contended to be defective, never conveyed to Clow that Metro considered it to be in breach of the contract, and in fact on several instances verified that the amount Clow claimed was the true balance due and owing. Furthermore, it appears that it was confirmed and well-thought out business decision of Metro to accept and repair any goods received from Clow instead of rejecting or requesting credit for the same. The evidence from the record is overwhelming and pertinent portions of the same will be excerpted.

The following appears in the deposition of Cecil M. Forbes, Jr., President of Metro Pipeline Company:

1—*Pages 97 and 98.*

We didn't request credit for anything from Clow. It was important that our relationship with Clow be kept as harmonious as possible because we had reduced ourselves to one source of supply and if they didn't give us a good price on the next job we wouldn't get it.

Q: So it was just your standard policy not to make any claims for broken pipe that was delivered to the job site?

A: Not against Clow . . .

2. Q: *Page 173.*

But that was your business decision that you didn't go back and rock the boat with Clow?

A: I wasn't going to antagonize Clow for anything. They were the only people that would quote me and I would have to get out of the water business if I antagonized them.

3. *Page 181.*

Q: During this period of time from the beginning of the Project through at least 1974 you have testified I believe that you did not ask Clow for any kind of set-off or credit because of defective pipe?

A: To my knowledge, the only credit we asked them for was two or three pieces, whatever it was, of two and one-quarter inch pipe.

Q: O.K. So, obviously you would not have protested against not having a credit or a set-off against the $190,000.00 principal amount that was due?

A: No, I didn't protest. I expected to get benefits from it on down the line, though.

4. *Page 182.*

Q: So you made a business decision that you were not going to try to set-off any of these amounts due?

A: Right.

5. *Page 183.*

Q: Again, at that time, had you had the money, the account would have been satisfied, the principal amount of the account would have been satisfied by you?

A: I feel like, yes, I would pay it.

Q: O.K.

A: Because I didn't like being in arrears with them either.

6. *Page 185.*

Q: You never told him [Clow credit manager] that you didn't think you owed the principal amount of the account, did you?

A: I don't recall ever telling him that.

Other pertinent parts of the deposition of Cecil Forbes indicate consistently the confirmed intention of Metro not to reject Clow products or to hold them in breach for any alleged defect.

Furthermore, on at least two occasions, the president of Metro admitted that the principal amount due and owing to Clow was $190,426.30: (1) An excerpt from a letter dated July 15, 1973 from Cecil M. Forbes, Jr. to Clow Credit Manager William M. Smithson, reads as follows:

Not counting the service charge, our principal balance due Clow is $190,426.30. I propose to send you either one or two checks for $21,500.00 which will leave the amount owed to Clow approximately what is owed to Metro by Spalding County . . . We are willing to make an assignment of all monies due us by Spalding County to Clow (see Exhibit "B" attached to Motion for Summary Judgment Against Metro).

2. A confirmation request dated October 31, 1973 prepared for Ernst & Ernst, Auditors of Clow, and signed by Cecil M. Forbes, Jr., admits that the account balance owed by Metro to Clow is $190,426.30 (see Exhibit "E" attached to Plaintiff's Motion for Summary Judgment Against Metro).

In the deposition of William M. Smithson (Credit Manager of Clow), the following testimony appears on page 22:

Q: Did Mr. Forbes ever complain to you about any of the products being supplied by Clow Corporation?

A: No, sir.

Additionally, the deposition of Steve Schneider, Clow salesman involved in this transaction, alleged that Forbes never communicated any criticism of Clow products to him.[3]

After a careful review of the record, and in accordance with the law as stated above, the Court holds that as a matter of law the affirmative defense and counterclaim alleged by the defendants must fail.

## VI. LIABILITY OF USF&G AS SURETY FOR THE PRINCIPAL UNPAID BALANCE

■ Under the provisions of Georgia Code §§ 23–1705 through 23–1708 the surety is liable on a payment bond executed pursuant to the same "for the sum or sums

due." It is agreed by all parties that $182,843.04 relates to the unpaid purchase price for goods used by Metro in the Project. Therefore, USF&G is liable for said amount.

Plaintiff in the instant suit seeks damages from USF&G for the principal balance in the amount of $189,755.62. Its is agreed by all parties that the excess of the same above $182,843.04 is in dispute because of alleged misapplication of payments and misallocation of invoices, and therefore must be set for trial.

## VII. LIABILITY OF METRO FOR CONTRACTUAL SERVICE CHARGES

■ The Court (see IV) has found that the terms and conditions of the agreement between Metro and Clow were framed by the original purchase order signed by Cecil M. Forbes, and by the Customer's Invoice Originals, which included a provision for a one per cent "service charge" on all balances unpaid thirty days after delivery. For a similar contractual provision see *Economy Forms v. Kandy*, 391 F.Supp. 944 (N. Dist. of Ga., Rome Div.). The Court finds that said contractual provision for a monthly percentage charge on any unpaid balance is equivalent to interest. While at this late date defendants argue that the same is not equivalent to interest, the Court notes that on page 15 of the deposition of Cecil M. Forbes, he refers to the service charge by calling it "interest". Furthermore, the cases cited, by defendant in an attempt to distinguish interest from service charges deal with circumstances entirely foreign to the facts in the instant suit—namely situations in which a lender's service charge was contended to constitute interest in an attempt by the borrower to persuade the Court that the lender's true interest was usurious because of the additional service charge. The Court finds

---

**3.** Metro's answer to Clow's Interrogatory # 14 of Sec. II (filed on August 30, 1976) and the deposition of Cecil M. Forbes refer to two purported conversations between Forbes and Schneider in which they allegedly discussed an unusual kind of erosion concerning certain pieces of pipe supplied by Clow; recollection of said conversations was denied by Steve Schneider on page 152 of his deposition. In any event, it is clear from the record that even if such alleged conversations had occurred, the subject matter of the same was not pursued by Metro; and there is nothing in the record indicating that Metro ever intended to hold Clow for breach of its contractual obligations.

these cases wholly inapplicable to the facts of this case in as much as the circumstances here involve a vendor-vendee relationship (not lender-borrower) and involve a monthly percentage charge on unpaid invoices and not a one-shot flat fee charge by a lender of money. While it may have been wiser for the plaintiff to have entitled the one per cent fee as interest, the Court follows the doctrine of substance over form and finds that such charge could be none other than an interest charge.

It is also contended by the defendant that interest is not appropriate under the circumstances because the plaintiff's claim is not liquidated. The Court finds no merit in this argument and states the well-recognized principle of law that the presence of an alleged unliquidated counter-claim does not convert an otherwise liquidated complaint by the plaintiff to an unliquidated claim. See *Haygood v. Smith,* 80 Ga.App. 461, 56 S.E.2d 310 (1949); *Buck Creek Industries, Inc. v. Crutchfield & Company,* 133 Ga.App. 80, 210 S.E. 32 (1974). Additionally, merely because the plaintiff's original demand on defendant was for more than the amount now demanded by plaintiff to be due and owing the claim is not deemed to be unliquidated. *Harris & Harris Construction Company v. Crain & Denbo, Inc.,* 256 N.C. 110, 123 S.E.2d 590 (1962). Furthermore, it is well-recognized that interest is recoverable upon a liquidated claim. See *Haygood v. Smith,* id.

Since it is apparent to the Court that, regardless of the alleged counterclaim which the Court finds to be barred as a matter of law, and regardless of the amount originally demanded by Clow, the total principal balance due and owing by Metro to Clow for goods delivered was ascertainable by all parties by reference to the invoices pertaining to the same. Therefore, the Court holds that the claim of Clow for the principal unpaid balance is liquidated, and that contractual service at one per cent per month is recoverable against Metro.

## VIII. LIABILITY OF USF&G AS SURETY FOR CONTRACTUAL INTEREST

In determining the liability of the surety on its payment bond the Court looks to the federal cases construing federal statutes similar to provisions contained in Georgia Code §§ 23–1704 to 23–1708. See *Amcon Inc. v. Southern Pipe & Supply Company, Inc.,* 134 Ga.App. 655, 215 S.E.2d 712 (1975) and *Porter-Lite Corporation v. Warren Scott Construction Company,* 126 Ga.App. 436, 191 S.E.2d 95 (1972).

As a general rule of law it can be stated that prejudgment interest is included in the "sums justly due" under the Miller Act. *L & E Company v. U.S.A.,* 351 F.2d 880 (9 Cir. 1965). Furthermore, the Court recognizes the distinction between legal interest and contractual interest which is contained in the agreement between the parties. The Court finds that the rule of law is that pre-judgment contractual interest is included in the "sums due" and that therefore the surety becomes liable for the same on its payment bond. In the case of *D & L Construction Company v. Triangle Electric Supply Company,* 332 F.2d 1009, 1013 (8 Cir. 1964) the court stated the following:

In our present case the sub-contractor by express contract with his supplier, Triangle, agreed to pay six per cent interest per annum on past due invoices and a reasonable attorney's fee. Such interest and attorney's fees are by such contract made part of the purchase price of the materials and are sums justly due to Triangle. The defendants are liable upon their bond for such sums justly due.[4]

Similarly, in the case of *Continental Casualty Company v. Allsop Lumber Company,* 336 F.2d 445, 458 (8 Cir., 1964) Judge Blackmun stated:

Prejudgment interest was one of the two items in controversy in our other recent Missouri Capehart bond case, *D & L Construction Company v. Triangle Electric Supply Company,* supra, 332 F.2d 1009. The bond there, just as the ones here,

---

4. See contra *United States v. MacDonald Construction Company,* 281 F.Supp. 1010 (E.Dist. Mo., 1968).

authorized recovery for the sum 'justly due' the claimant. There, as here, it was the supplier's invoices for the deliveries made to the contractor which stated that interest would be charged. The trial court's determination in that case pp. 913–914, 217 F.Supp. that the invoice provision constituted a part of the contract between the sub-contractor and the supplier was not challenged on appeal. This court then held that, although it is necessary, where there is no express contract for interest, to look at state law to measure the extent of the obligation, this is not so where interest is covered by express contract. We concluded that there was an agreement there to pay interest on past due invoices; that such interest was a sum 'justly due'; and that the defendants were liable for it under their Capehart bond . . . We conclude that the district court judgment should have made provision for prejudgment interest.

Finally, in the case of *U. S. v. F. D. Rich Company, Inc.,* 473 F.2d 720 (9 Cir. 1973) (reversed on other grounds), it was held that

> [T]he district court in its discretion awarded seven per cent interest for an *unliquidated* amount, under California Civil Code § 3287(b), from the date of filing of the action. This was error. The amounts awarded Industrial were liquidated. Each element of damages was specified by invoice, at the contract price, and thus was at least reasonably calculable. Industrial should have been awarded eight per cent interest, under the terms of the invoices, from the date payment was due (30 days after delivery).

In as much as the Court accepts the federal Miller Act bond and Capehart bond analogies to the payment bond executed in the instant case, it holds that the contractual interest of one per cent per month on invoices due and owing more than thirty days is included in the "sums due" as provided in Georgia Code § 23–1708. Therefore, USF&G is liable for said interest on all invoices pertaining to the amount of $182,843.04 principal sum for goods used in the bonded Project.

Pursuant to Rule 54(b) and Rule 56(d) of the Federal Rules of Civil Procedure it is hereby ordered that:

### ORDER OF COURT

1—Plaintiff's Motion for Summary Judgment Against Metro Pipeline Company, Inc. be granted in the amount of $190,417.30 plus one per cent interest per month on all applicable invoices unpaid thirty days after delivery of the items covered thereby;

2—Plaintiff's Motion for Summary Judgment against USF&G be granted in the amount of $182,843.04 plus one per cent interest per month on all applicable invoices unpaid thirty days after delivery of the items covered thereby;

3—Plaintiff's Motion for Summary Judgment seeking to discharge defendants' Counterclaim is granted.

4—Motion for Partial Summary Judgment by Metro and USF&G on the issue of service charges be denied;

5—All amounts claimed by Clow against USF&G in excess of $182,843.04 be set for trial.