In the Matter of BARNEY SCHOGEL, INC., Debtor.

**Bankruptcy No. 77 B 2454.**

United States Bankruptcy Court,
S. D. New York.

June 19, 1981.

Tunstead, Schechter & Torre, New York City, Withington, Cross & Park, Boston, Mass., for claimant; John R. Maguire, New York City, Philip M. Cronin, Boston, Mass., of counsel.

Kaufman, Taylor & Kimmel, New York City, for debtor; Irwin M. Taylor, New York City, of counsel.

HOWARD SCHWARTZBERG, Bankruptcy Judge.

Barney Schogel, Inc., the debtor-in-possession in this Chapter XI proceeding,[1] seeks an order expunging a claim filed by the Coronis Construction Co., Inc. for $251,-735.45. Coronis contends that its claim "is entitled to priority as it is a cost of administration incurred after the debtor petitioned to reorganize and was permitted to continue in possession of its property." The controversy arose after Schogel and Coronis entered into an agreement whereby Schogel was to manufacture windows according to specifications supplied by Coronis. Coronis contends that subsequent to the manufacture and installation of the windows it discovered that they did not satisfy the specifications. The windows were removed and replaced by Coronis approximately thirteen months after their installation. Coronis filed a claim charging Schogel for the cost of removing and replacing the windows, additional work done at the site due to the defective windows, general contractor overhead and profit, and hardship caused by

delays. Schogel argues that the asserted grounds of liability are "fallacious and totally without merit" because Schogel submitted a procedure for nominal remedial work as to the windows which was approved by Coronis, but Coronis nevertheless refused to grant Schogel permission to repair them, notwithstanding that they could have been readily and inexpensively repaired. In addition Schogel contends that the portions of the claim for general contractor overhead and profit and hardship caused by delay should not be allowed because they are unliquidated and not provable.

This case presents the court with a morass of issues, both legal and factual, the majority of which were not addressed by either party. A preliminary issue to be determined involves choice of applicable laws. The debtor, Barney Schogel, Inc., is a corporation domiciled in New York and the claimant, Coronis Construction Co., Inc., is a corporation domiciled in Massachusetts. Following written correspondence between the parties Schogel supplied windows to Coronis for installation in a building in Boston, Massachusetts. Coronis installed the windows and paid approximately $31,000 of the $32,000 purchase price to Schogel. Notwithstanding the performance by both parties neither party signed a formal contract. The windows were supplied for a project in Boston called the Pine Street Inn. The building was to provide public housing for the indigent. The Boston Redevelopment Authority owned the land and the Boston Housing Authority rehabilitated the building. Coronis was the general contractor for the project.

■ A federal court sitting in a diversity case must apply the conflict of laws rules of the forum state. *Klaxon v. Stentor Electrical Manufacturing Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); reaffirmed in *Day & Zimmerman, Inc. v. Challoner*, 423

---

1. This case was commenced on September 29, 1977 by the filing of a petition for an arrangement under Chapter XI of the Bankruptcy Act of 1898. Although the Act of 1898 was repealed by § 401(a) of Title IV of the 1978

Bankruptcy Reform Act, Pub.L.No. 95–598, 92 Stat. 2549, 2682, effective October 1, 1979, § 402(a), the repealed Act remains in full force and effect as to pending cases filed prior to October 1, 1979. See, § 403(a).

U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975). However, this case presents an interesting twist which precludes the mechanical application of the *Klaxon* rule. This controversy, which could have been brought in the U.S. District Court, 28 U.S.C. § 1332, but for the intervening Chapter XI proceeding, was brought in the Bankruptcy Court as an objection to the claim filed by Coronis. Hence, this court is not bound to apply the New York choice of laws rule if the facts indicate that a different rule should be applied.

The reported decisions on this issue do not involve objections to claims but rather involve the trustee's avoiding power under § 70(c) of the Bankruptcy Act of 1898. In *In re Holiday Airlines Corporation*, 620 F.2d 731 (9th Cir. 1980), the trustee brought an action to determine the validity of a lien filed under the Federal Aviation Act by the creditor, a Washington corporation. The debtor was a California corporation. In discussing the underlying issue of application of State lien law, the court stated:

"We agree with the bankruptcy judge that the rule in diversity of citizenship cases, i.e. of mechanical application of the conflicts law of the forum State, should not be required in bankruptcy proceedings, at least in Federal Aviation Act cases. The Bankruptcy Act is silent as to the appropriate choice of law when two States have competing interests."

620 F.2d at 734. This reasoning is supported by *Collier on Bankruptcy*, which states, "Although some courts have appeared to think that a bankruptcy court is obliged to apply the conflict-of-laws rules of the state of the forum, the more supportable rule is that the bankruptcy court should be free to exercise for itself the choice of applicable state law." 4B *Collier on Bankruptcy* ¶ 70.49, at 605–06 (14th ed. 1976).

■ In this case the New York choice of laws rule should be applied. The determination of whether or not Coronis has a claim will be based solely on the interpreta-

tion of state law.[2] The matter is one which would have been within the diversity of citizenship jurisdiction of the district court had Schogel not filed its Chapter XI petition. The fact that the controversy arose as an objection to a claim in a bankruptcy proceeding does not alter the legal underpinnings of the cause of action. The claim is based upon an alleged breach of contract under state law and the objection is bottomed on state law. Therefore, in this case it is appropriate to apply the choice of laws rule of the forum, New York.

In the recent Second Circuit decision, *Krauss v. Manhattan Life Insurance Co. of N.Y.*, 643 F.2d 98 (2d Cir., 1981), based upon the New York Court of Appeals decision in *Dym v. Gordon*, 16 N.Y.2d 120, 262 N.Y.S.2d 463, 209 N.E.2d 792 (1965), the court outlined the New York choice of law rule as a three step analysis:

1. The court must isolate the issue on which the laws conflict.

2. The court must identify the purposes of the conflicting state laws to determine whether a genuine conflict exists.

3. The court must examine the contracts of the interested jurisdictions to ascertain which has the closer connection with the facts of the case and thus has the superior interest in having its law applied.

In this case, the transaction between the parties involved the purchase of windows, which are goods within the meaning of § 2–105(1) of the Uniform Commercial Code. The section states:

" 'Goods' means all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action . . .".

Therefore, Article 2 of the Uniform Commercial Code, which applies to transactions in goods, U.C.C. § 2–102, will control the

---

**2.** If this court finds, based on state law, that Coronis has a claim against Schogel, federal bankruptcy law will be applied to determine whether the claim is an expense of administration. This is the only issue in the case involving the application of federal law.

determination of the dispute between Coronis and Schogel. In light of the fact that both New York, Schogel's domicile, and Massachusetts, Coronis's domicile, have enacted identical versions of Article 2 there is no conflict of laws and the controversy will be decided under the law that is common to both states.

*The Agreement*

█ A June 17, 1977 letter from the sales manager of Schogel to Coronis stated:

"We propose to furnish ... aluminum DHA2 HP50 double-hung windows ... tempered where required *in accordance with specifications Section 8C and Addendum # 1* and drawing A–31 and A–32 dated 1/18/77 and quantities as listed herein for the net sum of: THIRTY–TWO THOUSAND ($32,000.00) DOLLARS. [emphasis added]

In its reply, dated July 15, 1977, Coronis stated:

"We are sending under separate cover plans ... for your use in shop drawing preparation. A formal P.O. [Purchase Order] in the amount of $32,000 per your quotation of June 17, 1977 will follow shortly. *The only reservation of the architect is proof that the ... glass is equal in strength and insulation qualities to the [glass] specified. Please forward this data to this office as soon as possible in order to obtain approval.*" [emphasis added]

Schogel's sales manager, in a letter dated July 19, 1977, stated:

"I want to acknowledge and thank you for your letter of July advising that we would receive a contract to furnish only aluminum windows for subject project ...."

Included in the July 19th correspondence was a test report from United States Testing Company, Inc. The report indicated that it was prepared for Deer Custom Products Corporation[3] and that the subject of the test was a Series 250 I.G. Aluminum

Double Hung Window. In its sample identification section the report stated that the sash were inside glazed using Dow Corning # 790 Building Sealant bedding, $3/16''$ tempered glass and vinyl snap-in glazing beads. The report concluded:

"[T]he subject sample window ... was found to comply with the performance requirements of the referenced ANSI standard for category DH–A2–HP(50) windows."

With respect to test results the report stated that there was no entry of water when the windows were tested at 2.86 pounds per square foot (psf) or 6.24 psf.

In a letter dated August 26, 1977 from Coronis to Schogel the Assistant Construction Manager of Coronis stated:

"Enclosed are three copies of your Contract. Please sign, seal and return all three copies. One executed copy will be returned for your files."

The articles of the contract relevant to this proceeding stated:

"THIS AGREEMENT is made between the Subcontractor and the Contractor for consideration hereinafter named.

| | |
|---|---|
| Date of Agreement | August 23, 1977 |
| Subcontractor | Barney Schogel Incorporated 85 Beechwood Avenue New Rochelle, N. Y. 10801 |
| Contractor | Coronis Construction Co., Inc. |
| Project | Pine Street Inn |
| Location of Project | Bristol Street, Boston, Mass. |
| Owner | City of Boston, Boston Housing Authority |
| Architect | Childs, Bertman, Tseckares Associates, Inc. |

Article 1. The Subcontractor agrees to furnish all material and perform all work as described in Article 2 in Accordance with the Contract Documents between the Owner and the Contractor, including the Drawings, Specifications, Alternates, Addenda, General Conditions and Special Conditions, signed by the parties thereto or identified by the Architect, or are incorporated by reference or are otherwise referred to in the Contract Documents,

---

**3.** Deer Custom Products Corporation was a wholly owned subsidiary of Barney Schogel, Inc.

said Contract between the Contract and the Owner being dated June 1977 and hereby become part of this Agreement.

Article 2. The Subcontractor and the Contractor agree that the materials to be furnished are all windows required for the project as shown on the drawings and per Specification, Section 8C. All material will be furnished F.O.B. job site.

Article 3. The Contractor agrees to pay the Subcontractor for the performance of his work the sum of

Thirty-two Thousand Dollars ..and..no/100 ($32,000.00)

Article 4. The Contractor and Subcontractor agree to be bound by the terms of the General Contract, the General Conditions, Special Conditions, Drawings, Specifications, Alterations and Addenda as far as applicable to this subcontract, and also by the terms of this agreement.

Article 5. The Subcontractor agrees—

8. To furnish shop drawings, samples and/or catalog cuts for Architect or Owner's approval before proceeding with this agreement and not later than 15 days from date of this agreement.

9. That all changes or modifications to this agreement must be in writing and signed by an Officer of the Contractor and approved for payment as an extra to the general contract by the Owner. Work performed without complying to the previous will be done at the sale expense of the Subcontractor.

13. All material and workmanship furnished must meet with the complete satisfaction of the Owner, Architect and Contractor.

15. The Subcontractor shall, and on acceptance of this agreement, does hereby agree to guarantee its work and material for a period required by the General Contract, and shall leave its work in perfect order at completion, and the final payment shall not relieve the Subcontractor of responsibility for negligence of faulty materials or workmanship, and upon notice, *shall remedy any defects* due thereto and pay all expenses for any damage to other work resulting therefrom.

18. That this contract supersedes any prior agreements or proposals.

19. The Subcontractor agrees that in the event the contract documents between the Owner and the Contractor provides a procedure for the determination of disputes arising from the performance of the work, the Subcontractor at his own cost shall resolve all claims or other disputes in accordance with said procedure without recourse against the Contractor.

No deviation from contract plans or specifications will be permitted unless it is specifically brought to the attention of the General Contractor and approved by the General Contractor and Owner. Approval of documents or material may be rescinded if the above procedure has not been adhered to by this Subcontractor."

The formal contract was not signed by either party. Notwithstanding this fact Schogel delivered the windows to the project in Boston prior to July, 1978. The windows were installed in the building and Coronis paid Schogel approximately $31,000 of the $32,000 purchase price.[4]

Schogel contends that its proposal of June 17, 1977 was an offer which Coronis accepted in its letter dated July 15, 1977.[5] Coronis claims that its letter of August 26, 1977 constituted a counter-offer to Schogel's June 17th letter by proposing varying terms and that by replying to Schogel's

4. The fact that the windows were manufactured and supplied by Schogel and installed and paid for by Coronis makes it unnecessary to discuss the statute of frauds provisions of U.C.C. § 2–201. The enforcement of the contract is not an issue in this case.

5. In his brief Schogel's attorney states, "The trial here proceeded on the basis of [the two letters] constituting the contract between the debtor and the claimant." This statement is completely incorrect since no ruling was made during the trial. As a matter of fact the court stated, on p. 17 of the Transcript, Jan. 27, 1981:

"I realize that one of the key issues here will be which document or documents constituted the contract ...."

offer but conditioning its assent to terms additional to and different from those originally proposed by Schogel Coronis did not accept Schogel's June 17th offer. Coronis contends that the agreement between itself and Schogel is reflected by the terms of the mailed contract dated August 23, 1977 attached to the letter of August 26, 1977. Alternatively, Coronis claims that if its August 26th letter was not a counter-offer, it constituted added terms to Schogel's June 17th proposal which were accepted by Schogel as a result of its performance. As authority for its position Coronis relies exclusively upon the *Restatement 2d, Contracts* and the common law theory that an acceptance which varies from the terms of an offer operates as a counter-offer and a rejection of the offer. See *Restatement 2d, Contracts § 60; Oregon-Pacific Forest Products Corp. v. Welsh Panel Co.,* 248 F.Supp. 903 (D.Or.1965).

Notwithstanding the arguments of the parties, this court must look to the Uniform Commercial Code, more particularly U.C.C. § 2–207(3), which was not cited by either party, in order to determine the terms of the agreement.

That section states:

"Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract. In such case the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions of this Act." U.C.C. § 2–207(3). The official Comment to subsection (3) makes it clear that the facts of this case fall squarely within the scope of the section.

"In many cases, as where the goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made. In such cases, where the writings of the parties do not establish a contract, it is not necessary to determine which act or document constituted the offer and which the acceptance. See Section 2–204. The only question is what terms are included in the contract, and subsection (3) furnishes the governing rule."

Official Comment 7 to U.C.C. § 2–207.

The terms of the June 17th proposal by Schogel were also included in the formal contract submitted by Coronis on August 26, 1977.

Those terms were:

1. Schogel would furnish DHA2 HP50 double hung windows.

2. The windows would be manufactured in accordance with specifications Section 8C and the drawings.

3. The contract price would be $32,000.

These three provisions make up the contract between Schogel and Coronis.[6] Since Co-

---

**6.** The same result would be achieved employing an analysis under subsections (1) and (2) of U.C.C. § 2–207. Those sections state:

"(1) A definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

(2) The additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless:

(a) the offer expressly limits acceptance to the terms of the offer;

(b) they materially alter it; or

(c) notification of objection to them has already been given or is given within a reasonable time notice of them is received." U.C.C. § 2–207(1), (2). Schogel's June 17th proposal was an offer to sell windows on specified terms. Coronis's July 15th response was not an acceptance of the offer since it stated that the architects had reservations about the glass and they required more information before approval. Coronis's formal contract operated as an acceptance of the offer even though it contained terms additional to those proposed by Schogel.

Since Schogel and Coronis were merchants within the meaning of U.C.C. § 2–104(1), (Schogel dealt in goods of the kind and Coronis by its occupation as general contractor held itself out as having knowledge peculiar to the goods involved in the transaction), the additional terms of the formal contract would become part of

ronis paid the purchase price the only question is whether Schogel supplied DHA2 HP50 double hung windows[7] in accordance with specifications Section 8C. If it is determined that Schogel did not perform its obligations under the contract it will then be necessary to assess the amount of damages suffered by Coronis.

The relevant terms of the specifications in question, section 8C, provide:

"*8C–02 SCOPE OF WORK*

. . . .

B. Referenced Standards—The following Standards and specifications are part of this Specification where referenced

. . . .

American Society for Testing and Materials . . . ASTM E 331–70

. . . .

*8C–06 CONSTRUCTION*

. . . .

F. Glass and Glazing—. . . Glazing shall be set in wrap around virgin vinyl glazing channel (marine glazing). See Drawing for specific glazing requirements.

. . . .

*8C–11 WATER RESISTANCE TEST*

. . . The window unit shall meet a water resistance test in accordance with ASTM E–331–70."

Coronis's claim against Schogel is based on two assertions: (1) the windows did not satisfy the required water resistance test, ASTM E–331–70, (2) the glass was not set in a wrap around virgin vinyl glazing channel

*The Water Resistance Tests*

■ Prior to July, 1978 the windows supplied by Schogel were installed in the Pine Street Inn. There were no reports of leakage. Briggs Engineering & Testing Co. was called by the Architect to make a field water test of sample installations that had been caulked and sealed by Coronis to see if the installations were water-tight. The test was to be on the extreme perimeter of the windows to determine waterproofness because the windows, which were manufactured according to Coronis's measurements, were too small for the openings in the building. The test was conducted on July 12 and 13, 1978.

The test procedure employed by Briggs involved sealing the inside of the masonry opening with plastic and aluminum angles and gaskets and blocking, placing a fan in the middle of the plastic so as to allow the engineers to draw a vacuum and connecting garden hoses to a hydrant on the street and spraying water on the window from the outside. Although the purpose of the test was to measure the waterproofness of the actual window installations, the results indicated that water came in at the joint where the two sash met and also at the sill. In other words, the test indicated that the windows leaked.

In a letter dated July 24, 1978 from Coronis to the architects, Coronis objected to the test methods as improper with respect to the individual window units. Attached to a letter dated July 31, 1978 Coronis sent Schogel a copy of the Briggs report and a copy of the letter Coronis had written to the architects complaining of the testing

---

the agreement unless one of the provisions of subsection (2) applied. Clearly the numerous clauses of the formal document materially altered the contract so that the additional terms did not become part of the agreement. See, Official Comments 4 and 5 to U.C.C. § 2–207.

7. According to the American National Standard Voluntary Specifications for Aluminum Prime Windows of the Architectural Aluminum Manufacturers Association a DH–A2 window is a doublehung window which passes a water resistance test of 2.86 psf. A window may be designated as a DH–A2 HP50 (high perform-

ance) window if it satisfies a water resistance test of 3.33 psf.

For some unknown reason the parties in this case continuously made reference to a standard of 6.24 psf. Since this standard is not applicable to DH–A2 HP50 windows, the kind required to be supplied, one may only speculate that the mention of the 6.24 psf statistic in the United States Testing Company's report was relied upon by the architects. Nevertheless, if the windows had satisfied the 3.33 psf requirement they would have complied with the applicable contract specifications. See, *infra*, for further water resistance test reports.

method used by Briggs. Charles Brown, the vice-president of Coronis and supervisor of all of Coronis's construction projects spoke with a manager at Schogel after they received the Briggs report. Both parties agreed that the test was meaningless and did not conform to the standard required by the contract specifications. By a letter dated August 15, 1978 Schogel stated that an incorrect test was used by Briggs and the fact that the installed windows had not leaked during the rainy season was more pertinent.

The specifications required that the windows meet a water resistance test in accordance with ASTM E331–70. ASTM (American Society for Testing & Materials) E331–70 is the standard method of test for "Water Penetration of Exterior Windows, Curtain Walls, and Doors by Uniform Static Air Pressure Difference." As a summary of the test method Paragraph 2.1 states:

> "The test consists of sealing the test specimen into or against one face of a test chamber, supplying air to or exhausting air from the chamber at the rate required to maintain the test pressure difference across the specimen, while spraying water onto the outdoor face of the specimen at the required rate and observing any water leakage."

The apparatus includes:

> (1) A test chamber or box with an opening, a removable mounting panel or one open side in which or against which the specimen is installed and sealed. Included in the test chamber is at least one static pressure tap which measures the chamber pressure and an air supply opening.

> (2) An air system.

> (3) A pressure measuring apparatus.

> (4) A water supply system which delivers water uniformly against the exterior surface of the test specimen at a minimum rate of 5.0 U.S. gal./ft.$^2$h. This system must have nozzles spaced on a uniform grid located at a uniform distance from the test specimen.

The test-pressure difference or differences at which water penetration is to be determined must be specified and in no case may the pressure difference be less than 2.86 lb./ft.$^2$. With respect to calibration, a spray must provide at least 20 gal./h. for the four test areas and not less than 4 gal./h. in any one square. The air pressure difference is applied along with the specified rate of spray for fifteen minutes. Water leakage is defined as:

> "Penetration of water into the plane of the innermost face of the test specimen under specified conditions of air pressure difference across the specimen during a 15-min test period. In tests of windows and doors it also occurs whenever water penetrates through the frame of the test specimen."

John Lomash, the manager of the product evaluation department at United States Testing Company, testified with regard to the Briggs test that the water spray was in excess of the minimum specified on the ASTM test, the air pressure was also in excess of the contract specifications, and the description of the leakage was not very clear or precise.

Subsequently, Coronis retained Herman G. Protze, Inc., an independent testing agency. A test was performed at Protze's lab on September 5, 1978 on a window taken from the job site. The test chamber used was built by Coronis according to Protze's instructions. Charles Brown of Coronis testified that the Protze test complied with the ASTM methods. The Protze report stated that the test was conducted in strict conformity with ASTM E 331–70 and that the first test was made at 2.86 lb./sq. ft. whereas the second test was made at 6.24 lb./sq. ft., at the request of the architect. The report further stated:

"CALIBRATION The spray system was operated for 5 minutes and the calibration catch boxes showed the following satisfactory results:

| | | |
|---|---|---|
| Box 1 | Upper left | 9.9 gal./sq.ft./hour |
| Box 2 | Lower left | 12.8 " |
| Box 3 | Upper right | 8.7 " |
| Box 4 | Lower right | 10.5 " |
| Average | | 10.5 " |

TEST RESULTS Leakage occurred during Test #1 as follows:

| | |
|---|---|
| 2½ minutes | lower left sash (a) sill |
| 4½ " | lower right sash (a) sill |
| 6½ " | at meeting rail, right side |
| 11½ " | at meeting rail, left side |

Leakage occurred during Test #2 as follows:

| | | |
|---|---|---|
| 1 | minute | increased leakage at all four of above locations; air bubbles at lower left sash; leakage at top of bottom sash at lock. |
| 3½ | " | leakage, glass to sash, at numerous locations on left side of lower sash. |
| 11 | " | steady flow at sash lock area; rate of flow increasing. |

REMARKS The window did not satisfy ASTM Designation E–331–70 or the more stringent requirement of the Architect."

Coronis informed Schogel, in a letter dated September 5, 1978, that the Protze test revealed that the window leaked extensively in several areas and that it did not appear that the windows met the specification requirements.

Simpson, Gumperts & Heger, a firm of consulting engineers, was retained by Coronis in November, 1978. They toured the Pine Street Inn on November 3, 1978 and performed their tests on November 7, 1978. The tests were conducted by Stephen Condren and an engineering aide. Condren, who has an M.S. degree from the Massachusetts Institute of Technology stated that his specialty was materials, roofing, glazing and, primarily, roofing and water-proofing failures in buildings. Condren and his aide tested two windows with a hose stream. They ran water onto the exterior of the window at different areas for specific periods of time. Condren's report, dated November 16, 1978, stated:

"Water penetrates the frame at the connection of the jamb and the sill. This joint is formed by butting the sill to the jamb; the jamb is screwed to the sill using two screws. No sealants or gaskets were used in this seam; consequently, it is not watertight. A small amount of sealant had been smeared on the interior side of the window frame where the jamb and sill meet, but this is not an effective waterstop.

Water penetrates between the glass and the glazing channel into the operable sash and escapes into the building through the joints in the interior plastic glazing bead."

At the trial Condren testified that the test was not equal to the ASTM method since air pressure was not used but that his test was less stringent than the ASTM method. John Lomash from U.S. Testing stated at trial that the spray method employed by Condren could be either more or less stringent than the ASTM test depending on where the water was applied to the window and the amount of water applied to the window.

It is evident from the facts elicited at trial that both the Briggs test and the Simpson, Gumperts & Heger test did not comply with the procedure outlined by ASTM E331–70. Therefore the conclusions reached by those tests cannot be accorded any weight with regard to the question of whether or not the windows satisfied the contract requirements. However, there is no dispute that the Protze test was made in strict compliance with ASTM E331–70. In light of the test results which indicated that the windows leaked at 2.86 lb./sq. ft. (a lesser standard than that which is required for DHA2 HP 50 windows) it may be stated as a matter of fact that the windows did not satisfy ASTM E331–70, as required by the specifications incorporated into the parties' agreement, and that as a result Schogel failed to comply with the contract.

*The Glazing Channel*[8]

A glazing channel, according to John Lomash of U.S. Testing Co., is a piece of vinyl made out of semi-rigid materials in the shape of a "U" which goes over the glass. Compression is then applied to the window, in some instances by a glazing bead. In terms of the physical position of the channel, it is a depression lower than the level on which the window rests. Lomash testi-

---

**8.** Note, the contract specifications do not specify the type of glazing to be used. The specifications state, "Glazing shall be set in wrap around virgin vinyl glazing channel (marine glazing). See Drawing for specific glazing requirements." Therefore, any question as to the type of glazing used by Schogel is irrelevant. The narrow issue is, did Schogel provide a window with a *virgin vinyl glazing channel*?

fied that the drawing submitted to U.S. Testing showed a *"vinyl glazing strip"*.

The "rabbet" of a window is the area in which the glass sits. Alan Schogel, the president of Barney Schogel, Inc., testified that there was no channel in a Schogel window and that the rabbet was not a channel. Alan Schogel further testified that the windows had virgin vinyl glazing in the rabbet but that there was no channel.

In his testimony Alan Schogel admitted that the windows did not have glazing channels. This fact constituted a second failure to comply with the agreement requiring Schogel to supply windows in accordance with specifications section 8C.

*Contract Modification and Waiver*

The U. S. Testing Co. report submitted to Coronis on July 19, 1977 indicated that rigid vinyl glazing beads and Dow Corning # 790 Building Sealant were used in the test sample.

On September 2, 1977 Schogel sent shop drawings and a sample window to Coronis. On September 8, 1977 Coronis submitted Schogel's shop drawings to the architects. The architects were told that the drawings were not a complete set but that a complete set would be submitted if there were any problems with the first set of drawings. Although Coronis endorsed this set of drawings "O.K." on September 14, 1977, the architects told Coronis to forward more information and a complete set of drawings. The second set of drawings, dated October 6, 1977, received an approval stamp from the architects on November 2, 1977. Leslie I. Brown, an employee of the architects, stated that the architects approved Schogel's window as supplied under the name of Deer Custom Products, Inc. as an equal to those required by the specifications based on information provided to them at that time.[9] The second set of drawings was returned to Schogel marked approved by Coronis on November 18, 1977. The second set of drawings, with certain revisions, was marked approved for fabrication by Coronis on November 23, 1977.

Alan Schogel testified with regard to practice in the industry that specifications serve as a general guide and that the customary procedure is to submit shop drawings and a sample to the architect so that a determination may be made as to whether the proposed manufactured product, according to the shop drawings and sample, is what is desired. Alan Schogel further testified that it is not customary for the architect or an owner's engineer to perform tests on a project and that it is usual and customary within the industry to supply windows with the expectation that there would not be a test at the work site.

Schogel claims that there was ample opportunity for Coronis to inspect the sample window, especially in light of the description of the vinyl set forth in the report made by U. S. Testing Company. Schogel contends:

"It emerges as an indisputable fact that Coronis had an opportunity to see clearly what kind of window unit it was to receive from Schogel before Schogel proceeded with its manufacture and delivery. Under these circumstances it is clear that Coronis accepted the Schogel sample window as a prototype of the window Schogel was to fabricate and which Coronis would be installing for the authority.

. . . .

Having been furnished the sample window, the test report and the shop drawings, the duty rested upon Coronis to make its inspection thereof a full and comprehensive one . . . A duty rested upon Coronis to see to it that the inspection of the sample and the related documents was performed with care and that it should not give its approval lightly . . . Having approved the Schogel sample window and knowing that Schogel would rely thereon in proceeding to fabricate its contract work, Coronis is estopped to assert any claim for damages."

Schogel's argument relies exclusively upon the court of appeals decision in *Miron*

---

9. The depositions of Leslie I. Brown and Brian Shillue were admitted into evidence by virtue of this court's memorandum decision dated April 7, 1981.

*v. Yonkers Raceway, Inc.*, 400 F.2d 112 (2d Cir. 1968). In that case the Plaintiffs entered a horse in an auction sponsored by the Raceway. The terms and conditions of the sale provided; inter alia:

"Any other representation, warranty or guarantee of the Consignor which is announced or otherwise given shall not extend beyond 24 hours after the fall of the Auctioneer's hammer or until final payment is made, whichever is sooner."

The auction was held in the afternoon on October 19, 1965. During a lull in the bidding the Plaintiff's employee stated, with respect to the horse in question, "He's as sound as, as gutty a horse as you want to find anywhere. He'll race a good mile for you every time." The defendant's bid of $32,000 was the highest offered. The Raceway delivered possession of the horse to the defendant at 3:00 P.M. that day. The next morning the defendant's trainer noticed that the house had a bad leg. This discovery was confirmed upon examination by a veterinarian. The defendant notified that Raceway at 11:30 A.M. on October 20th that the horse was lame and demanded that the Raceway take the horse back. X-rays taken in the afternoon of October 20th revealed a broken splint bone rendering the horse unsound. At the trial the defendant testified that he was not an experienced horse buyer and that he did not examine the horse at the time of sale. The court found, as a matter of fact, that there had been no examination or inspection of the horse by the defendant or his agent prior to the time the trainer discovered the bad leg. The court also found that the symptoms displayed by the horse were apparent immediately or shortly after the fracture occurred and that if the horse had a bad leg at the time of the sale an examination would have disclosed that fact.

The court's analysis focused on the question of whether or not the defendant had accepted the horse by failing to make an effective rejection under U.C.C. § 2–602(1). The court stated:

"[The defendant] accepted the horse, then, if having had a reasonable opportunity to inspect it, he did not reject it within a reasonable time.

. . . .

A 'reasonable opportunity to inspect' U.C.C. § 2–606(1)(b), may of course encompass more than a reasonable time to inspect; here, there is no question that [the defendant] had the facilities for inspecting available, and the only question on appeal was whether he waited too long."

400 F.2d at 118. The court found that the defendant's own testimony showed that it is customary, when buying a racehorse, to have the horse's legs examined by a trainer or veterinarian and that the existence of this custom is very important in determining whether there was a reasonable opportunity to inspect the horse. Since the defendant did not have the horse examined at the place of sale or at his barn later on the day of the sale the court concluded that he passed up a reasonable opportunity to inspect the horse and that the attempted rejection was not made within a reasonable time.

█ The *Miron* case is clearly distinguishable from the instant case. The *Miron* decision deals with reasonable inspection in the context of acceptance or rejection of goods at the time of sale. Schogel asserts that the court's reasoning in *Miron* is applicable to this case because Coronois received shop drawings and a sample window prior to Schogel's production of the windows. Schogel contends that Coronois had an opportunity to inspect the sample and that it is clear that Coronis accepted the sample window as a prototype. Notwithstanding the explicit requirements of the specifications there is no authority for Schogel's contention that Coronis had a duty to inspect the sample window.[10] The Uniform Commercial Code refers to a right to inspect goods only in the context of accept-

---

10. The shop drawings do not indicate whether the window had or did not have a glazing channel.

ance or rejection of the goods and not a sample. See U.C.C. §§ 2–513, 2–606, 2–607, 2–608. Further, there was no proof offered by Schogel to sustain its assertion that Coronis had a reasonable opportunity to inspect the window. Indeed, Alan Schogel testified that in order to see into the rabbet, the glazing beads, which constituted the glazing on the Schogel windows, would have to be removed. Whether Coronis had the skill and the facilities to make such an inspection is a question of fact which was not established at trial.

With respect to Alan Schogel's testimony concerning the customary practice within the industry, it is true that "[a] course of dealing between parties and any usage of trade in the vocation or trade in which they are engaged or of which they are or should be aware give particular meaning to and supplement or qualify terms of an agreement." U.C.C. § 1–205(3). However, to prove a usage of trade, "a party must usually call on an expert." J. White and R. Summers, *Uniform Commercial Code*, p. 87 (1972). In light of Schogel's failure to produce any witnesses to support Alan Schogel's self-serving testimony, the testimony cannot be accorded any weight.

█ Although Coronis is not estopped from asserting a claim for damages, the question arises as to whether or not Coronis waived the specification requiring the windows to have a virgin vinyl glazing channel. U.C.C. § 2–209(4) states, "Although an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) it can operate as a waiver."[11]

"In waiver, the question is whether the waiving party knowingly and intentionally relinquished a right. The actions of the party asserting waiver are irrelevant. In the question of estoppel, while the intention of the parties sought to be es-

topped may be significant, the emphasis is on the actions of the party arguing estoppel ... The same facts may, but need not, establish both a waiver and an estoppel."

*Mitchell v. Aetna Casualty and Surety Co.,* 579 F.2d 342, 347–48 (5th Cir. 1978).

A "waiver is an intentional relinquishment of a known right." *Moss v. Old Colony Trust Co.,* 246 Mass. 139, 140 N.E. 803 (1923). *Alsens American Portland Cement Works v. Degnon Contracting Co.,* 222 N.Y. 34, 118 N.E. 210 (1917). In *Suburban Land Co. v. Brown,* 237 Mass. 166, 129 N.E. 291 (1921), the court stated with respect to the question of waiver:

"It may be shown by words or acts and may arise out of inferences from all attendant facts as well as from more express manifestations of purpose. Whether there has been a waiver, especially when it is implied from numerous facts, is usually a question of fact." [citations omitted]

In *Scaduto v. Orlando,* 381 F.2d 587 (2d Cir. 1967), the defendant-general contractor claimed that the subcontractor, plaintiff's assignor, was under a duty to comply with the specifications of the prime contract, which were incorporated by reference into the sub-contract. The plaintiff claimed that even if the specifications were incorporated into the sub-contract, the general contractor waived those provisions. The court stated:

"The determination of this issue depends upon detailed and specific findings ... as to the relative rights and duties of the parties under the sub-contract, and facts which show whether any of its terms were modified or amended, whether the rights of a party were waived, whether a party breached a duty and like matters."

---

11. There is no question that subsections (2) and (3) of U.C.C. § 2–209 are inapplicable to this case. Those subsections state:

"(2) A signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant much be separately signed by the other party.

(3) The requirements of the statute of frauds section of this Article (Section 2–201) must be satisfied if the contract as modified is within its provisions."

U.C.C. § 2–209(2), (3).

381 F.2d at 590–91. The court further stated that the subcontractor had the burden of showing that he performed the required work and if the subcontractor claimed that the contractor waived any rights which it had under the agreements the subcontractor had the burden of proving those assertions. See, *Bechtel v. Liberty National Bank,* 534 F.2d 1335 (9th Cir. 1976).

In this case there is a lack of credible proof as to whether or not Coronis intentionally waived the contract specification requiring the glazing to be set in a virgin vinyl glazing channel. Coronis's actions were not "so manifestly consistent with and indicative of an intent to relinquish voluntarily a particular right that no other reasonable explanation of [their] conduct is possible." *Buffum v. Chase National Bank of City of New York,* 192 F.2d 58, 61 (7th Cir. 1951) cert. denied 342 U.S. 944, 72 S.Ct. 558, 96 L.Ed. 702 (1952). Hence, it cannot be said that Coronis waived the contract specification or that Coronis should be estopped from asserting its claim.

*Acceptance*

The question at this point is whether or not Coronis accepted the windows supplied by Schogel. Any action taken by the architect is irrelevant to this controversy since the architect did not have a contractual relationship with Schogel. Schogel was only obligated to Coronis and whether or not Coronis had a dispute with the architect cannot color Coronis's actions vis à vis Schogel.

As previously stated, the windows were delivered and installed prior to July, 1978. Schogel was paid approximately $31,000 of the purchase price. Subsequent to the Briggs and Protze tests Schogel agreed to take the test window from Protze's lab and to repair it in order to determine the cause of the leak. In a letter, dated October 4, 1978, from Coronis to Schogel, Coronis stated that Schogel would make its own study of the window and determine the nature of the corrective measures which would be required to bring the window up to standard. Coronis stated, "Corrective measures, of course, will need the approval of the Archi-

tect and be subject to retesting." During October or November of 1978 Alan Schogel told Coronis that he had taken the window apart and had discovered that the sealant work done in the factory could be improved upon and that the window could be readily repaired so that it would pass the water resistance test.

In his report of November 16, 1978 Stephen Condren of Simpson, Gumperts & Heger stated:

"We cannot recommend any repair attempts with any confidence that would not involve complete removal, dismantling and rebuilding of the window units with positive water barriers. Such an operation may be more costly than the replacement with new windows."

In a letter dated November 29, 1978 from Herman G. Protze, Inc. to Coronis concerning the September 5, 1978 test on the Schogel window Protze stated, "[T]he window unit is readily repairable in a manner to produce a finished unit equal to a properly manufactured virgin window." This conclusion was based on an evaluation of the type of leak. Protze retested the Schogel window on December 7, 1978. Schogel had repaired the window as follows:

"The glazing beads were removed. The space between the edge of the exterior pane of glass and the glazing bead retaining leg was cleaned by brushing out the dust and wiping with Xylol. The entire perimeter was caulked with Schee-Morehead Acrylar Small Joint Sealer (acrylic base flowable sealant) using a needle-nosed caulking pump. The lower sash was opened and the area at the sill frame to jamb frame was cleaned and caulked using the described Acrylar."

Protze found that the window satisfied ASTM E331–70 at 2.86 psf. A second test, run at 6.24 psf at the request of the architect, revealed that the window still leaked. However, Protze stated, "In our opinion the given window can readily be made tight ...." Coronis sent Schogel a copy of this report on December 12, 1978.

Attached to a letter dated December 21, 1978 Coronis sent Schogel a copy of a De-

cember 19th letter from the architect which stated that the windows had been rejected because they failed to meet the contract specifications. In its letter Coronis stated:

"It is imperative that we receive an immediate reply from your company as to whether you will or will not replace the windows that have been installed on the project. Your decision in this matter is requested within five days."

In its reply dated January 4, 1979, Schogel stated that it believed that all the existing windows could be brought to the required standards through simple corrective procedures on the job. Schogel further stated, "[W]e suggest, despite the architects letter of December 19, 1978 that you allow the existing windows to be brought up to the standards required by the specifications." With regard to the architect's rejection letter, Schogel stated that the architect failed to mention the second Protze test and its conclusion as to repairs and that he disagreed with the architect's finding that the windows did not have a wrap-around virgin vinyl glazing channel.

Stephen Condren of Simpson, Gumperts & Heger observed the repaired window on December 11, 1978. In his report, dated February 2, 1979, he stated that he did not expect the outlined repairs to remain effective and that the Simpson firm could not recommend acceptance of the proposed window repairs.

In its letter of January 19, 1979 to Schogel, Coronis stated that it agreed with the proposal in the last paragraph of Schogel's January 4th letter concerning repairs and that the job site would be made available to Schogel during regular work hours.

Coronis advised the architect in a letter dated January 30, 1979 that Schogel would commerce repair and correction of the windows on February 1, 1979. In a letter to Coronis dated January 31, 1979 the Boston Housing Authority withdrew its approval and recommended that no corrective work be done.

Alan Schogel testified that notwithstanding Coronis's letter stating that it would make the job site available, at the time Schogel was prepared to go to Boston to make the corrections Charles Brown of Coronis was alternatively saying, "No, windows are rejected, don't do anything" and then "Yes, come on up and do a group of windows and we will have those tested and see if that will meet the architect's requirements." Alan Schogel also testified that he had a conversation with Charles Brown wherein they discussed repairing a limited number of windows so that the repaired windows could be checked and approved. However, Alan Schogel admitted that at no time did Schogel state in writing that it was going to repair only sample windows.

On February 1 and 2 of 1979 a representative of Schogel repaired eight windows. No further repairs were made after February 2, 1979. Alan Schogel testified that Schogel was not asked to correct any other windows and that they were specifically told to just do eight windows although they were willing to continue with the repairs. He further stated that after February 2nd Coronis did not ask Schogel to return to the job site to repair additional windows.

Walter Rich, the construction manager for Coronis, stated with regard to the repair of the windows that he received no word from Schogel after February 2nd as to what Schogel was going to do about the windows.

In a letter from Coronis to Schogel dated June 22, 1979 Coronis stated that the architects through the Boston Housing Authority had officially rejected all the windows and had refused to allow repairs. Coronis further stated that it had purchased replacement windows and would look to Schogel for reimbursement.

U.C.C. § 2–606(1)(b), (c) states:

"Acceptance of goods occurs when the buyer

. . . . .

(b) fails to make an effective rejection (subsection (1) of Section 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership...."

A buyer of goods may reject the goods if the goods fail in any respect to conform to the contract. U.C.C. § 2–601(a). However, "rejection of goods must be within a reasonable time after their delivery or tender . . . ." U.C.C. § 2–602(1).

An analysis of the facts of this case, under either subsection (b) or (c) of U.C.C. § 2–606(1), results in the conclusion that Coronis accepted the windows supplied by Schogel.[12] Under subsection (b) of U.C.C. § 2–606(1), the dispositive question is whether or not Coronis had a reasonable opportunity to inspect the windows. A proper inspection would have involved performing the ASTM water resistance test prior to the installation of the windows in the building. In light of the fact that ASTM E331–70 could only be performed on a window which had been placed in a test chamber, Coronis clearly had a reasonable opportunity to perform the test before all the windows were installed. Therefore, Coronis is deemed to have accepted the windows since they were not rejected within a reasonable time.[13] See, *Miron v. Yonkers Raceway, Inc.*, 400 F.2d at 112; *T.J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338 (5th Cir.1980); See generally, U.C.C. § 2–513(1) and Official Comment 3 to § 2–513.

■ Pursuant to U.C.C. § 2–606(1)(c) acceptance of goods occurs when the buyer does any act inconsistent with the seller's ownership of the goods. Whether there is an acceptance under this section is a question of fact for the court to determine from the evidence in the case. *Dehahn v. Innes*, 356 A.2d 711, 19 U.C.C. 407 (Me.1976).

In *Cervitor Kitchens v. Chapman*, 82 Wash.2d 673, 513 P.2d 25, 13 U.C.C. 458 (Wash.1973) Chapman, as general contractor, purchased four kitchen units to be installed in a university dormitory. In May,

1967 Chapman received the goods which had been enclosed in shipping crates. No inspection was made at the time of delivery even though Chapman's manager noticed minor exterior shipping damage on two of the crates. The units were stored in the crates until August, 1967 when Chapman installed them in the dormitory. Shortly thereafter the project engineer informed Chapman that the kitchen units were of poor quality and did not comply with the contract specifications. The court held that acceptance took place upon Chapman's installation and that installation without inspection after over three months of delay was inconsistent with the seller's ownership especially since the claimed deficiencies would have been readily apparent had there been an inspection. Accord, *U.S. v. Crawford*, 443 F.2d 611 (5th Cir. 1971), *Clow Corp. v. Metro Pipeline Co., Inc.*, 442 F.Supp. 583 (N.D.Ga.1977).

■ In the instant case, the installation of approximately 262 windows by Coronis coupled with its failure to discover the defects, which should have been discovered prior to installation, was an act inconsistent with Schogel's ownership of the windows.

■ Although Coronis accepted the nonconforming windows it could have revoked its acceptance had it acted in accord with the provisions of U.C.C. § 2–608(1)(b), which states:

"The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it . . . without discovery of such non-conformity if *his acceptance was reasonably induced either by the difficulty of discovery before acceptance* or by the seller's assurances." [emphasis added]

*v. 81,193 Bags of Flour*, 629 F.2d 338 (5th Cir. 1980).

12. The fact that Coronis paid for the windows did not foreclosure their right to inspect them before acceptance. "Failure to inspect before payment does not impair the right to inspect after receipt of the goods unless the case falls within subsection (4) on agreed and exclusive inspection provisions." Official Comment 3 to U.C.C. § 2–513; See, *T.J. Stevenson & Co., Inc.*

13. Note that Coronis did not notify Schogel of its rejection of the windows until June 22, 1979 and that even this correspondence was somewhat ambiguous.

In *Lynx, Inc. v. Ordnance Products, Inc.*, 273 Md. 1, 327 A.2d 502, 15 U.C.C. 1040 (Md.1974) the court stated,

> "[T]he buyer cannot revoke his acceptance ... if he did not know of the nonconformity at the time of acceptance because of his own failure to make a reasonable investigation which was readily available ...."

Cf.: *Desilets Granite Co. v. Stone Equalizer Corp.*, 133 Vt. 372, 340 A.2d 65, 17 U.C.C. 769 (Vt.1975) (nonconformity could not be discovered before actual use of the goods).

Coronis's acceptance was not reasonably induced by the difficulty of discovery of the leaks before acceptance since it would have been more convenient for Coronis to have had the windows tested prior to their installation. This situation can be distinguished from the facts in *McCormick v. Ornstein*, 23 U.C.C. 888, (Ariz.1978), where the court permitted revocation of acceptance when a trailer was accepted upon receipt without a prior inspection. The court found that the buyer could not have known of structural defects in the welding without the aid of an expert's inspection. In this case, Coronis accepted the windows when it installed them in the building. The water resistance test, which was made by an expert, could have been performed prior to the installation and therefore prior to acceptance.

■ Although Coronis accepted the windows, acceptance does not of itself impair any other remedy provided by Article 2 of the Uniform Commercial Code for nonconformity. U.C.C. § 2–607(2). However, "where a tender has been accepted the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." U.C.C. 2–607(3). There is no dispute that Coronis notified Schogel of a problem within a reasonable time after it received the results of the Briggs test. Therefore, Coronis is entitled to a claim for damages against Schogel based upon Schogel's failure to comply with the contract specifications.

**Breach of Warranty**

■ The agreement between Schogel and Coronis, which incorporated Schogel's original proposal of June 17, 1977, provided that Schogel would furnish "aluminum DHA2 HP50 windows ... in accordance with specifications Section 8C ...." This created an express warranty on the part of Schogel that it would supply windows which would satisfy the contract specifications. This court finds that Schogel breached the agreement by supplying windows which failed the applicable water resistance test, ASTM E331–70, and by supplying windows which did not have glazing set in a virgin vinyl glazing channel. Both of these requirements were explicitly set out in specification section 8C. U.C.C. § 2–313(1)(b) states:

> "Express warranties by the seller are created as follows ... Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description."

It is clear that "a description need not be by words [and that] technical specifications ... can afford more exact description that mere language and if made part of the basis of the bargain goods must conform with them." Official Comment 5 to U.C.C. § 2–313.

The instant situation falls directly within the scope of U.C.C. § 2–313. Schogel's proposal included specifications which were made part of the basis of the bargain. Indeed, there can be no doubt that Schogel would not have received the contract had they proposed to furnish windows which did not comply with specifications section 8C. Therefore, Schogel's tender of nonconforming windows which were accepted by Coronis, constituted a breach of its express warranty.

In *S–C Industries v. American Hydroponics System, Inc.*, 468 F.2d 852 (5th Cir. 1972), American provided a set of plans and specifications for a greenhouse to S–C several months before the greenhouse was purchased. The plans contained a specification for a steel truss which stated, "42' Rigid

Steel Frame all bolt connections—20 PSF Snowload, 16 PSF Windload." The court, discussing creation of an express warranty stated:

> "[T]he specifications created an express warranty that the structure as a unit would withstand a vertical load of 20 pounds per square foot. Since [the court below] found as a fact that the collapse of the structure was a result of its weakening under a load of less than 20 pounds per square foot, we also agree with the court's conclusion that there was a breach of the express warranty."

468 F.2d at 855.

*Measure of Damages*

Having established that Coronis has a claim against Schogel as a result of Schogel's breach of warranty, there next remains for determination the measure of damages to be allowed. Professors White and Summers, writing on the question of the rights of a buyer who has accepted nonconforming goods have stated:

> "The principal Code section that governs the rights of a buyer who has accepted nonconforming goods is 2–714. We believe that only buyers who have accepted and neither rejected nor revoked can use 2–714. Thus, in our view, sections 2–713 and 2–712 on the one hand and 2–714 on the other are mutually exclusive."

J. White and R. Summers, *Uniform Commercial Code*, p. 306 (1972), U.C.C. § 2–714 states:

> "(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2–607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.
> (2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

> (3) In a proper case any incidental and consequential damages under the next section may also be recovered."

The W. T. Rich Company was hired as construction manager in December, 1978 because Coronis was unable to complete the Pine Street Inn project due to financial difficulties. Rich was paid by Travelers Insurance Co., Coronis's bonding company. Rich testified that when his company was hired the project was two-thirds complete. He stated that of the remaining work, 70% was directly related to the windows. Acting pursuant to the owner's directive to replace the windows, Rich solicited quotations and received five bids. A.B. Maddison Co., Inc. was the low responsive bidder. A subcontract was entered into on March 2, 1979 between Coronis and Maddison for $100,851. The subcontract provided that:

> (1) The subcontractor would furnish labor, materials, equipment and scaffolding to complete all the work in § 8C dealing with aluminum windows.

> (2) The subcontractor would complete the perimeter caulking between the new sash and masonry openings as specified in § 7B of the specifications.

> (3) The subcontractor was responsible for the removal of existing sash and the unloading, hoisting and distributing of new sash.

Maddison began work on July 24, 1979 and completed work on October 1, 1979. Thus, no corrective work was done by anyone between February 2, 1979, when Schogel's representative left the job site, until July 24, 1979, when Maddison commenced replacement of the windows. Rich testified that he observed Maddison remove the existing perimeter of caulking around the exterior of the window, remove the window from the opening after it was freed from its anchors, remove the windows from the site, bring in new windows, place the new windows in the openings after they were reframed, and recaulk the exterior. Approximately 262 windows were removed from the building.

With respect to the cost of the windows, Rich stated that he would charge $35 per

window to take the window and place it in the opening, i. e., nail it in place. Rich also stated that as an experienced general contractor he would charge $40,000 to install all the windows in the building and would charge an additional $10,000 to remove the windows from the exterior wall. Alan Schogel testified that $150 per window would cover the window, its installation and removal.

In addition to the Maddison contract, additional work was performed at the site directly related to the removal and reinstallation of the windows. This work was done under the supervision and observation of Rich's company. Rich paid for this work with funds paid to his company by Travelers Insurance Co. Rich testified that the fair value of this work was $40,239.23 and that the cost included reframing window openings, removing dry walls, realigning studs, changing blocking, reinstalling wallboard and resanding. Rich stated that with respect to the allocation of the cost of the work performed by other subcontractors between window and nonwindow related work that he kept the costs separate and that the costs were ascertained by daily records and, in many cases, by signed slips.

At the trial Rich testified as to the following costs, not including the cost of the Maddison contract:

(1) $9117.50 for revising the furring and returns at the window openings. He stated that this cost was necessary because the new windows had a slightly different configuration than the Schogel windows and would not fit in the existing openings. He stated that each window manufacturer has a slightly different window configuration as far as the sill is constructed and the manner in which the windows fit into particular openings.

(2) $4046.15 for retaping.

(3) $20,091.92 for the revision of the window openings at the drywall areas, i. e., taking the drywall off and studs down in order to remove the window and putting the new window in and reframing the opening. He stated that this cost was comprised of two charges

(a) $5681.96 from Beacon Dry Wall.

(b) $14,409.96 from Schena Construction Company, Inc.

(4) $9117.50 for the revision of the wood block of the new windows.

(5) $26,000 (approx.) for general contractor overhead and profit based on a rate of 10% for overhead and 10% for profit.

According to Rich's original testimony, the total claim based on construction costs, exclusive of the Maddison contract was $68,-373.07. However, on cross-examination Rich stated that the first charge mentioned, $9,117.50 for revising the furring and returns, was the same as the charge for the revision of the wood-blocking, the fourth charge. Therefore, $9117.50 must be reduced from Coronis's claim as a duplicate charge.

At this point it is necessary to compare the claim filed by Coronis with the testimony adduced at trial. Coronis's claim as filed on October 26, 1979, totalled $251,735.41. Included in that amount was a claim for delay in the sum of $100,000. At the trial Coronis withdrew this portion of the total claim. This reduced Coronis's claim to $151,735.41. In the filed claim Coronis indicated the individual charges as follows:

(1) $100,851 for removing and replacing window sash (the Maddison contract).

(2) $6,508.29 for revising the furring and returns at window openings.

(3) $4,878.28 for revision to window openings at dry wall areas.

(4) $4,046.15 for retaping areas to windows.

(5) $9,117.50 for revising wood block at new windows.

(6) $26,334.25 for General Contractor overhead and profit.

There is a discrepancy between the total amount claimed by Coronis in its filed claim and the total claim as testified to by Rich at the trial. There is also a discrepancy between the individual components of the filed claim and the claim as broken down by Rich at the trial. During the course of the proceeding this court stated, with respect to this issue, "[T]hey will be limited to those items in the claim." This ruling became the law of the case and will be applied when

determining the allowed amount of Coronis's claim. See, 1B *Moore's Federal Practice* § 0.404(1) at 402–03 (2d ed. 1974); *Schupak v. Califano*, 454 F.Supp. 105 (E.D.N.Y.1978).

Coronis's claim as filed, exclusive of the withdrawn portion for delay, totals $151,735.47. At the trial, Rich testified that the cost of the Maddison contract was $100,851 and that the fair value of the other work done on the premises was $40,239.23. The sum of these amounts is $141,090.23. Although inconsistent with the filed claim, this amount represented Coronis's total claim before Rich identified the particular charges comprising the claim. Based upon Rich's testimony as to the amount of each charge the total claim is $169,224.07 less $9,117.50, the duplicate charge, or $160,106.57. Since Coronis's claim is limited to the filed amount, the court must reconcile the individual charges in the filed claim with the individual charges, as testified to by Rich, with the filed charges as the maximum amount to be allowed. This task is made more complicated by Rich's use of descriptions of the work at the trial which did not correspond to the descriptions in the filed claim. Placing these fixtures in chart form somewhat simplifies the reconciliation.

Filed Claim

(1) $100,851 (removing and replacing window sash—the Maddison contract)

(2) $ 6,508.29 (revising the furring and returns at window openings)

(3) $ 4,878.28 (revising the window openings at drywall areas)

(4) $ 4,046.15 (retaping)

(5) $ 9,117.50 (revising wood block at new areas)

(6) $ 26,334.25 (general contractor overhead and profit)

Claim based on Rich's testimony

(1) $100,851 (Maddison contract)

(2) $ 9,117.50 (revising the furring and all returns at window openings

(3) $ 4,046.15 (retaping)

(4) $ 20,091.92 (revising window openings at drywall areas)
 (a) $ 5,681.96 from Beacon Dry Wall
 (b) $14,409.96 from Schena Construction Co., Inc.

(5) $ 9,117.50 (revising wood block of new windows)

(6) $ 26,000 (approx.) (general contractor overhead profit)

Item 1 of both columns refers to the $100,851 Maddison contract. Although both Rich and Alan Schogel testified that they could do comparable work for a lesser amount the amount is allowed as claimed, since Maddison was the low responsive bidder on the contract.

Item 2 of the claim based on Rich's testimony, $9117.50 for revising furring and returns at window openings, is a duplicate of Item 4 for revising wood block at new windows. Therefore, the claim, based on Rich's testimony must be reduced by $9117.50. With respect to any charges for revising furring and returns, Rich stated that they would be included under the $20,000 item, Item 4 of the claim.

According to the testimony, Item 4 of the claim of $20,091.92 for revising window openings at dry wall areas, also includes any charges for revising furring and returns. Items 2 and 3 of the filed claim, in the total amount of $11,386.57, represent the filed claims for revising furring and returns and for revising the window openings at dry wall areas. Therefore, Coronis's claim for these items is limited to a maximum of $11,386.57. Rich testified that the $20,091.92 charge was comprised of two separate charges; a bill of $5,681.96 from Beacon Dry Wall and a bill of $14,409.96 from Schena Construction Company, Inc. Schogel's attorney introduced into evidence two invoices from Schena to Coronis for work done at the Pine Street Inn. The first invoice, Exhibit A is in the amount of $7,901.67 and the second invoice is in the amount of $5,225.25. Since Coronis's claim

for these charges has already been limited to a maximum of $11,386.57 there is no need to investigate the discrepancy between Rich's testimony that the Schena charges were $14,409.96 and the invoices which indicate that the total charge was $13,126.92. However, since these invoices were admitted into evidence and the validity of the charges reflected therein was questioned by Schogel it is necessary to determine if Coronis's claim for the work performed by Schena should be allowed as a claim against Schogel.

> Exhibit A, the invoice for $7901.67 states: "The following is an invoice for overrun of estimated hours performed at the [site]. These overrun of hours was due to the repeated trips to the same areas caused by your directing us to perform in an area not ready for us. For example the exterior windows held us up due to changes and we were instructed to perform leaving these areas to be done at a later time."

Rich testified that the overrun had been caused because he had told Schena to go to certain window areas but that the windows had not been replaced and Schena could not do its work. He further stated that the window problem existed when his company came on the job and that as construction manager it was his duty to coordinate the work of subcontractors but that the situation with the exterior windows made this coordination very difficult. He stated that as general contractor, he had the responsibility for removing the Schogel windows but that he had Schena come to the job site notwithstanding that the preliminary work had not yet been done. Based upon Rich's testimony Schena's charge for $7901.67 cannot be allowed as a claim against Schogel.

The only evidence on this point is Rich's testimony which establishes that the cause for the charge was poor coordination of subcontractors and not Schogel's defective windows. Therefore, $7901.67 must be deducted from the $11,386.57 which has been set as the maximum allowable amount for the charges in question.

Exhibit C, an invoice from Schena for $5225.25 refers to work Schena had done prior to the installation of the Schogel windows but had to redo because of the replacement of the windows. There is no evidence that this charge should not be allowed as a claim against Schogel. However, since the maximum allowable claim for revising furring and returns and revising window openings at dry wall is $11,386.57 less $7901.67, Coronis's claim for these charges is limited to $3484.90.

With respect to the $4,046.15 charge for retaping, which was identical on both claims, Rich testified that the charges would have been incurred by Coronis to some extent, in order to finish the installation of the Schogel windows but that this is not the only bill for taping and that this charge applied only to the portion of the work done in areas where the Schogel windows had been removed. Therefore, this charge is allowable as a claim against Schogel.

Coronis has claimed approximately $26,000 for general contractor overhead and profit according to both the filed claim and Rich's testimony. However, at the trial Coronis's attorneys stated that the total amount of the claim was $100,851 and $40,239.23 or $141,090.23.[14] This necessarily precludes the allowance of the claimed amount for overhead and profit. In fact,

---

**14.** The following colloquy took place at the trial:

THE COURT: What is the amount of the claims that you're now asserting?

MR. CRONIN: We have put in the total amount of the claim.

THE COURT: Which is what?

MR. CRONIN: Which would be the amount of—I'm sorry—

MR. TAYLOR: The maximum bill is a hundred thousand.

THE COURT: $100,851.

MR. CRONIN: And $40,000—

THE COURT: The other bill is $40,239.23.

MR. MAGUIRE: That's correct, Your Honor.

MR. CRONIN: —which would be the total of our claim.

THE COURT: So, it's $141,090.23.

MR. CRONIN: That's correct, Your Honor, . . . .

See pages 31 and 32 of the Transcript, January 29, 1981.

Rich included as a component of the total claim of $40,239.23, exclusive of the Maddison contract, general contractor overhead and profit. This amount was based on a rate of 10% for each item.[15]

Based upon the foregoing, the total allowed amount of Coronis's claim against Schogel[16] is $120,829.26,[17] comprised of the following:

(1) $100,851.00 for the Maddison Contract
(2) $ 9,117.50 for revising wood block at new windows
(3) $ 3,484.90 for revising furring and returns and revising window openings at dry wall
(4) $ 4,046.15 for retaping
(5) $ 3,329.71 for general contractor overhead and profit based on items 2–4 at a rate of 10% for each item.

*Proof of Damages*

In his brief Schogel's attorney states: "It was incumbent upon Coronis at the trial to prove its damages. It is respectfully submitted that there was an utter failure of such proof within the meaning of the applicable law of damages."

Ordinarily it would be necessary to review the bills supporting the testimony as to damages sustained in a breach of contract action. However, in this case the conduct of counsel during the trial have made such a review unnecessary. At the end of Rich's testimony concerning the amount of damages suffered by Coronis, the following colloquy took place:

"THE COURT: You may step down, Mr. Rich—unless you have any questions with regard to this specific itemization.

MR. TAYLOR: That's why I would like him to wait around. Ordinarily, these would be offered into Evidence in one of these cases and we have a chance to cross-examine—

THE COURT: Do you want to offer them in Evidence now?

MR. CRONIN: I'll be glad to put them in Evidence.

MR. TAYLOR: I say ordinarily that would be so. We may just be burdening the Court and the record unnecessarily but I have not seen these things before.

THE COURT: How do you propose to handle it?

MR. TAYLOR: Well, I think we indicated a little bit later on this afternoon if we have a chance, Your Honor, to look through it.

THE COURT: Okay, fine.

MR. TAYLOR: I'll do everything to expedite the trial in this matter, Your Honor."[18]

Based upon the foregoing, Schogel cannot complain that Coronis failed to support its evidence as to damage by not putting into evidence itemized bills. Not only did Schogel's attorney state that it would not be necessary to put the relevant documents into evidence, he was given the documents to review so that he could cross-examine Mr. Rich. Therefore the testimony as to the damages incurred and the amounts paid will be accepted as uncontradicted.

*Damages under the Uniform Commercial Code*

As previously stated, U.C.C. § 2–714 governs the rights of a buyer who has accepted nonconforming goods. Coronis's claim is comprised of two charges:

---

15. Mr. Rich stated, at the trial:

A Item 2 of this list of January 12th, '81—Item 2, invoices from Scana Construction Company Inc., for window opening alteration work $14,209.96. Item 3, invoices from Beacon Dry Wall for window opening alteration work, $5,681.96. Invoice from Wallboard (phonetics) Construction Company Inc., for tapeing at windows, $4,046.15 and cost from W. T. Rich Company Inc., to revise wood blocking at windows, $9,117.50. Items 2 through 5 total $33,255.57. That's Items 2, 3, 4 and 5 and with 10% for overhead and 10% for profit—the profit on those items—the total of Items 2, 3, 4 and 5 with overhead and profit is a total of $40,239.23.

See page 46 of Transcript, January 29, 1981.

16. Note, this claim is the maximum amount which Coronis may assert against Schogel, subject to proof and whether or not these damages may be allowed under U.C.C. § 2–714.

17. Whether or not Coronis is entitled to a claim for the $31,000 it paid Schogel will not be considered since Coronis did not claim that amount either in the filed claim or at trial.

18. See the Transcript, p. 52, January 29, 1981.

(1) the cost of removing and replacing the Schogel windows, the Maddison contract.

(2) the other work directly related to the removal and reinstallation of the windows.

U.C.C. § 2–714(2) provides that the measure of damages for breach of warranty is the difference between the value of the goods as accepted, at the time and place of acceptance, and the value the goods would have had had they been as warranted, unless special circumstances show proximate damages of a different amount. Generally, the contract price offers strong evidence of the value of the goods as warranted. J. White and R. Summers, *Uniform Commercial Code*, p. 309 (1972). With respect to the value of the windows as accepted, in light of the owner's directive to replace the windows, they had no value to Coronis. Therefore, the value of the goods had they been as warranted is $32,000, the contract price. However, since Coronis failed to claim this amount, it must be disregarded at this time.

■ In this case there exist special circumstances which show proximate damages of a different amount, namely, the $100,851 expenditure to remove and replace the windows under the Maddison contract. Coronis afforded Schogel the opportunity to repair the windows in January, 1979 but Schogel failed to act and only repaired eight windows at the job site in February, 1979. Although Alan Schogel testified that he had an agreement with Charles Brown of Coronis that Schogel would only repair a limited number of windows, so they could be tested and approved, he admitted that this agreement was not in writing. Opposed to Alan Schogel's testimony is the testimony of Rich who stated that he received no word from Schogel after February 2nd as to Schogel's next step with respect to the repair of the windows. In light of Alan Schogel's self serving testimony, the lack of documentary proof, and Rich's conflicting testimony, Schogel has not established that there was an agreement that it would repair only sample windows. Therefore, Coronis is justified in claiming the cost of removing and replacing the defective windows. The cost of the Maddison contract was proximate damage of a different amount caused by special circumstances; Schogel's failure to repair the windows pursuant to the agreement of the parties. See, *Acme Pump Co., Inc. v. National Cash Register Co.*, 32 Conn.Supp. 69, 337 A.2d 672, 16 U.C.C. 1242 (Conn.C.P.1974).

With respect to the remaining $19,978.26 of Coronis's allowed claim, that amount represents the cost of work done at the job site due to the removal and replacement of the Schogel windows. Of that amount, $3,329.71 is for general contractor overhead and profits. It must be determined whether these amounts may properly be charged as incidental and consequential damages against Schogel. U.C.C. § 2–714(3).

■ U.C.C. § 2–715 states:

"(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b) injury to person or property proximately resulting from any breach of warranty."

The cost of the work done at the Pine Street Inn due to the defective Schogel windows is an incidental damage which may be asserted as a claim against Schogel. The evidence establishes that the charges for revising wood block at the new windows, revising furring and returns, revising window openings at dry wall and retaping were directly related to the replacement of the Schogel windows. See, *Louis De Gidio Oil & Gas Burner Sales & Service, Inc. v.*

*Ace Engineering Co., Inc.*, 15 U.C.C. 801 (Minn.1974); *S. M. Wilson & Co. v. Reeves Red-E-Mix Concrete, Inc.*, 39 Ill.App.2d 353, 350 N.E.2d 321, 19 U.C.C. 1125 (Ill.1976); *Lanphier Construction Co. v. Fowco Construction Co.*, 523 S.W.2d 29, 17 U.C.C. 713 (Tex.Civ.App.1975).

 Coronis's claim for general contractor overhead and profit, which has been limited to $3,329.71, is not an incidental or consequential damage within the meaning of U.C.C. § 2–715 and therefore, cannot be asserted in Coronis's claim against Schogel. Coronis failed to prove that they were reasonably entitled to such damages. *Industrial Graphics, Inc. v. Asahi Corp.*, 485 F.Supp. 793 (D.Minn.1980). The only evidence on this point was Rich's testimony that his company charges 10% for overhead and 10% for profit. This testimony, without any supporting evidence, is insufficient to establish that this was an expense incident to the breach or a loss which resulted from Coronis's particular needs with respect to which Schogel had knowledge at the time of contracting. See, U.C.C. § 2–715.

Therefore, the total claim which may be asserted by Coronis against Schogel for the breach of warranty on the windows is $117,499.55. The claim is comprised of

(1) $100,851.00 for the Maddison contract.
(2) $ 9,117.50 for revising wood block at new windows.
(3) $ 3,484.90 for revising furring and returns and revising window openings at dry wall.
(4) $ 4,046.15 for retaping.

*Status of the Claim*

 Coronis asserts that its claim is a proper cost of administration and is entitled to priority under § 64a(1) of the Bankruptcy Act of 1898.[19] This section states:

**19.** See, note 1, supra.

**20.** On this issue Schogel's attorney states that no order was sought or obtained by any interested party authorizing the assumption or adoption of the contract by the debtor in possession. Notwithstanding this fact, "until assumed or rejected, an executory contract or unexpired lease remains in force and if neither assumed nor rejected, passes with other property of the debtor to the reorganized corporation." *In re Shoppers Paradise, Inc.*, 8 B.R. 271

"§ 64. Debts Which Have Priority. a. The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment shall be (1) the costs and expenses of administration, including the actual and necessary costs and expenses of preserving the estate subsequent to filing the petition . . . ."

The focal point of this inquiry is the date of the filing of the bankruptcy petition. If the claim arose prior to that date it must be treated as an unsecured claim. In this case, Schogel filed its Chapter XI petition on September 29, 1977. Previously, this court found that it was the conduct of the parties which recognized the existence of the contract and not the writings between them. Since Schogel supplied the windows after the filing date and Coronis paid for them after the filing date Coronis's contention that its claim is a cost of administration is correct.

A similar conclusion is reached if it is assumed the contract between the parties was entered into in August, 1977.[20] In such instance the filing of the Chapter XI petition would have followed the agreement between the parties but would have preceded the supply of the windows to Coronis, Coronis's payment for the windows and the discovery of the breach. The decisions on this issue have consistently held that "a claim arising under an executory contract is entitled to priority 'if the trustee or debtor in possession elects to assume the contract or if he receives benefits under it.' *American Anthracite and Bituminous Coal Corp. v. Leonardo Arrivabene, S.A.*, 280 F.2d 119, 124 (2d Cir. 1960); *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)."

(Bkrtcy. S.D.N.Y. 1980). See, *Consolidated Gas Electric Light & Power Co. v. United Railways & Electric Co.*, 85 F.2d 799, 805 (4th Cir. 1936) cert. den. 300 U.S. 663, 57 S.Ct. 493, 81 L.Ed. 871 (1937); *Smith v. Hill*, 317 F.2d 539 (9th Cir. 1963); *Federal's Inc. v. Edmonton Investment Company*, 404 F.Supp. 68, 71 (E.D. Mich. 1975) aff'd 555 F.2d 577 (6th Cir. 1977); 8 *Collier on Bankruptcy*, ¶ 3.15(6) at 204 (14th ed. 1978).

*Matter of Unishops, Inc.*, 553 F.2d 305 (2d Cir. 1977). See, *In re W. T. Grant Co.*, 620 F.2d 319 (2d Cir. 1980).

In this case there is no question that the contract was executory at the time of the filing of the petition;[21] an executory contract being "a contract under which the obligations of both the bankrupt and the other party to the contract are so unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973). There is also no question that Schogel received a benefit under the contract; namely the receipt of $31,000. Hence, the claim would be a cost of administration and as such, entitled to priority.

The case of *Denton & Anderson Co. v. Induction Heating Corp.*, 178 F.2d 841 (2d Cir. 1949) is illustrative of a situation where the court held that the debtor's claim was not a cost of administration. In that case the debtor filed its petition for an arrangement on November 30, 1948. The previous July the debtor, a manufacturer, and its representative had entered into a contract which provided that the representative had the exclusive right to submit and procure orders for the debtor's goods in certain areas. Prior to the filing of the bankruptcy petition the representative had secured orders for the debtor's goods which the debtor had accepted but did not fill until after the petition was filed. The representative claimed that his commissions on the sale were an administrative expense. The court held that the representative's claim had not been incurred after the bankruptcy filing but had been incurred before the filing when the debtor accepted the orders procured by the representative. The court stated that at the time of the filing the representative could have filed a claim since he had fully performed under the contract. In the Schogel case neither party had fully performed at the time of the filing of the

Chapter XI petition. At the time of the filing Coronis had no claim against Schogel since the breach was not discovered until the windows were installed in July, 1978.

*Conclusion*

Coronis's claim against Schogel for breach of an express warranty to furnish windows according to specifications section 8C is limited to $117,499.55. This claim is a cost of administration and is entitled to priority under § 64(a)(1).

SUBMIT ORDER on notice.

---

**21.** Note that in this part of the discussion it is assumed that the agreement was made in August, 1977 as the parties contend.